1630 N. Main St., #258
Walnut Creek, CA 94596-4609
November 21, 2016

Chief Judge Roger L. Efremsky
United States Bankruptcy Court, Northern District
Oakland Division
Post Office Box 2070
Oakland, CA 94604-2070

Re: Case No. 16-42917 - West Contra Costa Healthcare District, San Pablo, CA;
    Objection to Claim of Contra Costa County

We are a party of interest in this case because our association represents the interests of local residents and non-resident real property owners. Though we cannot afford an attorney, we have numerous concerns about the West Contra Costa Healthcare District and feel a duty to report inaccuracies we find in the court record.

The purpose of this letter is to file an objection to the scheduled claim of Contra Costa County in the amount of $14,400,000.00.

## BACKGROUND

1. West Contra Costa Healthcare District, the debtor in this Chapter 9 Case (the "District") filed its petition for relief on October 20, 2016.

2. On October 20, 2016, the District filed a List of Creditors Holding the Largest Unsecured Claims with the Bankruptcy Court (Court Document 3), which names as its largest creditor Contra Costa County with a claim of $14,400,000.00 for an "unsecured loan."

## OBJECTION

The County's Claim is not for a loan, but an advance of parcel tax revenues. Further, the County's tax advance was improper because it does not meet legally-required conditions. As a result, the tax transfer agreements between the District and the County, which form the basis of the County's claim as a bankruptcy creditor of the District, are unenforceable. Accordingly, the County's claim should be disallowed.

We submit this Objection to obtain an order disallowing the claim for the following reasons:

1. On June 17, 2014 the Contra Costa County Board of Supervisors adopted Resolution No. 2014/218 authorizing the transfer of property tax revenues from the District to the County by executing a THIRD AGREEMENT FOR PROPERTY TAX TRANSFER FROM WEST CONTRA COSTA HEALTHCARE DISTRICT TO CONTRA COSTA COUNTY effective July 1, 2014. Under the terms of this agreement, the County transferred up to $6 million of general purpose capital reserve revenues to the District. In exchange, the agreement provides that the County would receive up to $8.2 million of the District's reallocated property tax revenue.

2. The County's adoption of Resolution No. 2014/218 followed previous property tax transfers from the District to the County in October 2006, April 2011 and July 2013.

3. Following the County's adoption of Resolution No. 2014/218, on July 1, 2014 the County executed a property transfer agreement between the District and the County that states, in part, the "District has not . . . admitted in writing its inability to pay its debts as they become due." This statement is inaccurate. When the County adopted Resolution No. 2014/218, there was an abundance of compelling evidence available indicating the District was insolvent. Accordingly, when County officials executed the property transfer agreement on July 1, 2014, they knew or should have known the District was in severe financial distress and was unable to meet its financial obligations. Under these conditions County officials should have reasoned that, by executing a new property transfer agreement with the District, they were placing the County at risk.

4. Execution of the July 1, 2014 tax transfer agreement followed release of the District's audit report dated December 31, 2012, which included a note regarding "Going Concern Uncertainty" stating, in part: "The Hospital has experienced recurring cash shortages and has a net deficit of ($8,048,000). These matters raise substantial doubt about the District's ability to continue as a going concern."

5. Execution of the July 1, 2014 tax transfer agreement followed release of a draft District audit report dated December 31, 2013 that was presented to the District governing board at its June 16, 2014 meeting. This draft report included a note regarding "Going Concern Uncertainty and Subsequent Event" stating, in part:

> "The District has experienced recurring cash shortages and has a net deficit of ($27,468,000). In May 2014, an additional parcel tax initiative was added to a special election taking place in Contra Costa County. The proposed additional tax was defeated and will not be available to improve the District's financial situation. Without this funding the District will be strongly considering ceasing operations and closing the hospital. Barring an unforeseen event, the Board will meet in June 2014 for a vote on the possible closure and ceasing of operations of the Hospital. These matters raise substantial doubt about the District's ability to continue as a going concern."

4. In authorizing the transfer of property tax revenues made pursuant to County Resolution No. 2014/218, the County stated that it relied on California Revenue and Taxation Code Section 99.02 and California Government Code Section 26227.

5. California Revenue and Taxation Code Section 99.02 permits the reallocation of general property taxes among taxing agencies, subject to certain conditions. One of the required conditions is the District must have "available sources of revenue for this purpose." This condition was not met on any of the occasions that the District agreed to transfer property tax revenues to the County because, on each such occasion, the District needed all of its revenues, including its ad valorem taxes, to cover its expenses. Therefore all tax transfer agreements between the District and the County are void and improper.

6. California Government Code Section 26227 states, "The board of supervisors of any county may appropriate and expend money from the general fund of the county . . . to fund . . . programs deemed by the board of supervisors to be necessary to meet the social needs of the population of the county." Under this Code Section, the County may "appropriate and expend" without conditions.

7. The transfer of property tax revenue made pursuant to County Resolution No. 2014/218 provided that the District would receive $6 million from the County on the condition that the District transfer up to $8.2 million of its allocation of ad valorem taxes to the County. This arrangement is inconsistent with California Government Code Section 26227 because it requires the District to give up $8.2 million of its tax allocation in order to receive a County tax advance of $6 million.

8. In an e-mail dated June 16, 2014 from Eric Suitos of the Contra Costa County Office of County Counsel to County resident Alicia Minyen, Suitos stated that the transfer of property tax revenue made pursuant to County Resolution No. 2014/218 "is not a loan and there is no interest involved."

9. The transfer of property tax revenues made pursuant to County Resolution No. 2014/218 did not include execution of a loan agreement or promissory note.

10. For all of these reasons, the tax transfer agreements between the District and the County are unenforceable. Accordingly, the County's claim should be disallowed.

Thank you for your consideration of this information.

Best regards,

*[signature]*

Wendy Lack
Chair, Alliance of Contra Costa Taxpayers

Attachment:
    Email thread dated 6/16/2014 to 6/31/2014, between Contra Costa resident Alicia Minyen and Contra Costa County Supervisors/County Counsel's Office.

From: aliciaminyen
To: wml2001
Subject: Fwd: Questions/Concerns RE: DMC and Loan
Date: Mon, Oct 31, 2016 10:24 pm

----- Forwarded Message -----
From: aliciaminyen
To: "john gioia" <john_gioia@bos.cccounty.us>, supervisorandersen@bos.cccounty.us, dist3@bos.cccounty.us, district5@bos.cccounty.us, "david twa" <david.twa@cao.cccounty.us>, sande@cc.cccounty.us
Cc: "Russell Watts" <russell.watts@tax.cccounty.us>, "Bob Campbell" <bob.campbell@ac.cccounty.us>
Sent: Monday, June 16, 2014 12:26:14 AM
Subject: Questions/Concerns RE: DMC and Loan

Dear Sharon Anderson (County Counsel):

I'm writing to you because I'm concerned about the County's liability that it has assumed with regard to the West Contra Costa Healthcare District ("WCCUSD"). In reading the June 17, 2014 D.5 Agenda and Official Statement to the December 2011 $40 million Certificate of Participation ("COP") issued by WCCHD, I have the following questions and concerns that I hope you will address as the County Board of Supervisors considers extending an additional $6 million loan.

See the Official Statement ("OS") at:

http://emma.msrb.org/ER546481-ER423315-ER825444.pdf

1. Page Appendix A - Page 3 of the COP OS states that a Hospital Governing Body was created in April 2011 in connection with a "Tax Exchange Agreement". It appears that this Governing Body assumed authority and responsibility that was otherwise borne by the Elected Board of WCCHD. My concern is that this exposes the County to unlimited liability with regard to any action or complaint caused by WCCHD. I learned that in fact the WCCHD has included the County on its liability insurance policy.

Why would the County expose itself to such liability especially since the risk of liability has increased as a result of DMC's current crisis?

Were the pre-existing loans extended by the County (that are subject to the Tax Exchange Agreement) a requirement of a County Lending Policy?

Is it lawful for the County to extend loans to special districts without having a Governing Body? Is it possible to limit or remove your liability as a result of having a Governing Body?

Does the County have a Lending Policy and does this policy allow for loans to be extended to special districts that are financially insolvent?

Does the County have a separate liability insurance policy, such as an E & O policy, in connection with the Governing Body of WCCHD?

The indemnification clause in the Third Agreement for Property Transfer only addresses WCCHD indemnifying the County...How can the County protect itself from claims made by third parties (other than those made by the District)?

2. The COP resulted in WCCHD entering into an Installment Sales Agreement with WCCHD - Financing Corporation II ("Financing Corporation") where WCCHD technically sold DMC to the Financial Corporation. However, I learned that Gemino, a line of credit provider to WCCHD, has asked for additional collateral in the form of a Deed of Trust on the DMC building (i.e., a lien on the DMC building).

Is it lawful for the WCCHD board to encumber the DMC Building with an additional Deed of Trust given that the hospital building was sold to the Financing Corporation in connection with the COP?

3. The Third Agreement for Property Transfer states under Item 4 that WCCHD has not admitted in writing that it cannot pay its bills as they become due.

http://64.166.146.155/docs/2014/BOS/20140708_459/18424_DMCThird%20WCCHD%20Tax%20Exchange%20Agreement%20-

%20CC6-19-14.pdf

You should note that WCCHD has effectively admitted that it cannot pay its bills as they become due when they issued their financial audit report for the period ended December 31, 2012. Not only does the audit report, which is prepared in writing by the district, show massive deficits and net operating losses, it also discloses that it is in violation of debt covenants for its line of credit provider, Gemino. (Thus, the need for providing Gemino additional collateral in order to prevent Gemino from closing the line.) Auditors to this 2012 audit also gave an opinion that they had substantial doubt about the district's ability to remain as a going concern. Further, the district has made it publicly known that I cannot afford to stay open without millions in financial assistance.

December 31, 2012 Audit Report:

http://emma.msrb.org/ER695205-ER539372-ER940766.pdf

Therefore, you may want to reconsider the language used under Item 4 of the Agreement. In addition, I'm concerned that the County will not be paid back in full or in a timely manner. For example, it is my understanding that the district is allocated $3 million in ad volarem taxes. Would the amount of ad volarem taxes be impaired/reduced as a result of the hospital reducing its services to merely an ER and/or would tax allocations be reduced if the hospital were to close?

I would appreciate it if you address the questions/concerns above. If they have been addressed, I would appreciate it if you provide me with the appropriate documents and disclosures.

Sincerely,

Alicia Minyen, CPA

Case: 16-42917    Doc# 27    Filed: 11/29/16    Entered: 11/29/16 11:21:08    Page 5 of 10

From: aliciaminyen
To: wml2001
Subject: Fwd: More Concerns RE: DMC and Tax Transfer
Date: Fri, Oct 28, 2016 12:54 am

Below is the email I wrote to the County and the Supervisors in response to the County telling me there was no loan.

I asked a lot of questions about the risk of a bankruptcy, but I never received a response.

Alicia

----- Forwarded Message -----
From: aliciaminyen
To: "john gioia" <john_gioia@bos.cccounty.us>, supervisorandersen@bos.cccounty.us, dist3@bos.cccounty.us, district5@bos.cccounty.us, "david twa" <david.twa@cao.cccounty.us>, sande@cc.cccounty.us
Cc: "Full Name" <bob.campbell@ac.cccounty.us>, "Russell Watts" <russell.watts@tax.cccounty.us>
Sent: Monday, June 23, 2014 1:06:20 AM
Subject: More Concerns RE: DMC and Tax Transfer


Dear County Counsel, Board of Supervisors, and Auditor-Controller:

I've reviewed the County's response to some of my questions/requests made on June 15, 2014. Please note that I'm not providing legal advice. However, I have additional concerns regarding the Tax Agreement approved by the Board of Supervisors on June 17, 2014, where the West Contra Costa Healthcare District ("WCCHD") may be on the hook for up to $8.2 million in ad volarem taxes in exchange for $6 million provided by the County. In addition, I respectfully disagree with the County's response to me that there is no loan with regard to WCCHD.

1. Loan to WCCHD or Not a loan

You state that the County relied on Government Code 26227 with regard to providing the County $6 million, and the County relied on the Revenue & Tax Code 99.02 with regard to WCCHD agreeing to transfer up to $8.2 million in ad volarem taxes in the future. As stated previously, the County has informed me that this arrangement is not a loan. However, I believe this arrangement is a loan because the $6 million provided to WCCHD under Gov. Code 26227 was given WITH CONDITIONS, and the $6 million would not have been provided without WCCHD agreeing to transfer or give up its allocation of $3.09 million in ad volarem taxes to the County. Furthermore, during the Board of Supervisors meeting, I heard certain Supervisors say they were concerned the County "would not be paid back". These terms also indicate that the Board of Supervisors also understood the $6 million to be a loan. Has the County consulted with its independent accounting firm about whether the County should recognize and record these transactions as a loan in its financial statements in accordance with governmental accounting standards?

2. Government Code 26227

http://law.onecle.com/california/government/26227.html

It appears Government Code 26227 is intended to allow the County to give money to fund essential services within the County. Gov. Code 26227 states that the County Board of Supervisors may "appropriate and expend" from the "general fund" to fund services to meet social needs, etc. I believe the County using its general funds to pay for social needs is considered an act of "appropriate and expend"...because the funds are given WITHOUT CONDITIONS. However, in this situation, WCCHD will receive the $6 million WITH the condition that WCCHD transfer up to $8.2 million of its allocation of ad volarem taxes to the County ...a $2.2 million spread.

I question the appropriateness of requiring WCCHD to use its ad volarem taxes as collateral to pay back the County. I also believe it may be problematic to require WCCHD to transfer additional ad volarem taxes in amounts greater than the amounts extended by the County.

Has the County obtained an IRS determination with regard to the Tax Agreements executed in the past and present?

3. Tax Transfer - Conditions of R&T 99.02 Not Met

The transfer of taxes from WCCHD to the County falls under Tax and Revenue Code 99.02 (as stated in the Resolution). Please pay special attention to the conditions under 99.02(f).

http://www.boe.ca.gov/lawguides/property/current/ptlg/rt/99-02.html

My concern is that WCCHD does not meet all the conditions of 99.02, and therefore, the tax transfer should not take place.

In fact, the California State Attorney General Opinion actually addressed the issue of when a local agency can transfer its ad volarem taxes under Attorney General Opinion #05-809 published February 9, 2006. This opinion indicates that the Tax and Revenue Code 99.02 can be intended to allow for local agencies who no longer need their allocation of property tax and to transfer their unneeded allocation of taxes to another local agency.

http://ag.ca.gov/opinions/pdfs/05-809.pdf

"Hence, it is evident from this legislative history that the current language of section 99.02 is intended to authorize local agencies to enter into agreements changing the property tax revenue allocation as between them in the absence of a jurisdictional change." The opinion quoted the analysis of AB 241 which said, "The purpose of this bill is to give local government more flexibility in their own fiscal affairs. There could be a number of reasons why an agency would want to give some of its property tax to another. Its revenue picture or service needs may change over time so the fixed amount of property tax is no longer needed." (Assem. Floor, 3d reading analysis of Assem. Bill No. 241 (1985-1986 Reg. Sess.) as amended July 9, 1985, pp. 1-2.)"

However, in the case of WCCHD, WCCHD desperately needs all of its revenues, including ad volarem taxes, and its revenues are not sufficient to cover its expenditures.

The Attorney General Opinion 05-809 and R&T 99.02 clearly state that the transfer of taxes shall not take place unless certain conditions are met. For example, R&T 99.02(f) states, in part, that the District shall not transfer its taxes unless it "has available sources of revenues for this purpose". As you all know, the district is suffering from massive net operating losses and deficits. DMC will close without millions in cash infusions from outsiders. Therefore, WCCHD does not have "available revenues", and it seems improper for the County to accept the transfer of such taxes from WCCHD.

I would also argue that there is no available source of revenue for the current $8.2 million tax transfer agreement since the current allocation of ad volarem taxes is being used to make payments on a prior tax exchange agreement executed in 2011 where there is still about $10 million outstanding. It may be over 3 years before WCCHD may begin payments via ad volarem taxes on the recently executed tax agreement.

Further, WCCHD does not meet another condition, which is "the transfer will not impair the ability of the transferring agency to provide existing services.". Well, WCCHD will have $3 million less to pay for its vital health services it provides to the Community since it gives up its tax revenue to the County. Further, I believe the County is exacerbating the ability of WCCHD to meet these conditions by requiring that WCCHD allocate tax revenues in excess of what was loaned by the County.

Because of the aforementioned, I'm concerned that the Tax Agreements executed between WCCHD and the County are not enforceable.

5. Clawback Risks

During the June 17th meeting, County Counsel shared an opinion from outside legal counsel regarding whether the County would be paid back in the event of a bankruptcy. My concern is that a bankruptcy trustee may deem the tax agreements to be void and improper considering that WCCHD did not meet all the conditions of 99.02 at the time of execution or during the life of the agreements. As a result, I'm concerned that the Bankruptcy Trustee, under these circumstances, may clawback all or up to 6 years of tax transfers made to the County. The Bankruptcy trustee may have the incentive to seek a clawback of ad volarem taxes and use such revenues to settle debts, such as the Certificates of Participation ("COP")(especially in light of risk disclosures in the Official Statement to the 2011 COP that there is no case law on the matter of the statutory lien placed on the 2004 parcel tax). Has the County sought a legal opinion with regard to the risk of a clawback?

This would be important with regard to ensuring how the County's financial statements should account for a contingent liability in the event WCCHD files bankruptcy.

Even though you have already approved the $6 million loan, I would appreciate it if you answer the questions/concerns

described above considering the financial risks involved. In addition, I hope that you will timely share the decisions being made by the special task force made up of experts from Sutter/John Muir and by the Governing Body over the future of WCCHD. I didn't notice the minutes to the Governing Body on the WCCHD website. Where can I find the minutes to the Governing Body?

Sincerely,

Alicia Minyen, CPA

---

Original message --------

From: Eric Suitos

Date:06/16/2014 4:53 PM (GMT-08:00)

To: aliciaminyen

Cc: "Sharon L. Anderson" ,David Twa ,Patrick Godley

Subject: RE: Your Inquiry Re: DMC and Loan

Dear Ms. Minyen:

To clarify, Government Code section 26227 allows the Board of Supervisors to use money from the general fund to support programs that the Board deems necessary to meet public health and safety needs. Revenue and Taxation Code section 99.02 permits a special district, such as the West Contra Costa Healthcare District, to transfer property tax revenues that it otherwise would be entitled to receive to another public agency, in this case the County. This transaction is not a loan and there is no interest involved.

---

ContraCostaCountySealEric Suitos

Executive Secretary

Office of the County Counsel

651 Pine Street, 9th Floor

Martinez, California 94553

(925) 335-1800 (Phone)

(925) 646-1078 (Fax)

From: aliciaminyen
Sent: Monday, June 16, 2014 4:08 PM
To: Eric Suitos
Cc: Sharon L. Anderson; David Twa; Patrick Godley
Subject: RE: Your Inquiry Re: DMC and Loan

Deae Eric,

Thank you for your response. Please note that Government Code 26227 states that the County may appropriate or "expend" money from the "general fund". This Code does not appear to address WCCHD'S situation where the County is "lending" (which is different from expending) its "reserves" ( which is different from the general fund since reserves are typically restricted and/or can only be spent under certain conditions.)

Is there any other law you are relying on that addresses under what circumstances the Board of Supervisors can lend to another public agency? Is there a law that allows you to charge and earn interest on such loans especially in light of the fact you are a government entity exempt from taxation. Further is there a Lending Policy that has been established by the County?

Sincerely, Alicia Minyen

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------

From: Eric Suitos

Date:06/16/2014 2:08 PM (GMT-08:00)

To: aliciaminyen

Cc: "Sharon L. Anderson" ,David Twa ,Patrick Godley

Subject: Your Inquiry Re: DMC and Loan

Dear Ms. Minyen,

Thank you for your recent inquiry to County Counsel Sharon Anderson. As noted in Resolution 2014/218, the transfer of funds to the District and transfer of property taxes to the County are authorized by California Government Code section 26227 and

Case: 16-42917    Doc# 27    Filed: 11/29/16    Entered: 11/29/16 11:21:08    Page 9 of 10

Revenue and Taxation Code section 99.02. We have referred your request for documents to the Health Services Department for response.

Regards,

Eric Suitos