SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Telephone:     (213) 623 9300
Facsimile:     (213) 623 9924

GARY W. MARSH (admitted *pro hac vice*)
gary.marsh@dentons.com
DAVID GORDON (admitted *pro hac vice*)
david.gordon@dentons.com
DENTONS US LLP
303 Peachtree Street, Suite 5300
Atlanta, GA 30308
Telephone:     (404) 527 4000
Facsimile:     (404) 527 4198

Attorneys for Debtor
WEST CONTRA COSTA HEALTHCARE
DISTRICT

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>WEST CONTRA COSTA HEALTHCARE DISTRICT.<br><br>Debtor.<br><br>Tax ID: 94-6003145 | Case No. 16-42917-RLE<br><br>Chapter 9<br><br>MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE DISTRICT'S FIRST AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS DATED JULY 21, 2017<br><br>Hearing Date:  October 12, 2017<br>Time:  9:30 a.m.<br>Place:  1300 Clay Street, Courtroom 201, Oakland, California<br>Judge:  Hon. Roger L. Efremsky |

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA, 90017-5704
(213) 623-9300

# TABLE OF CONTENTS

I. BACKGROUND ..................................................................................................2

    A. Events Leading Up to the Filing of the Chapter 9 Case ...........................2

    B. The Chapter 9 Case ...................................................................................3

    C. The Plan & Disclosure Statement ............................................................4

II. ARGUMENT ....................................................................................................5

    A. Jurisdiction & Venue ................................................................................5

    B. Notice, Solicitation & Acceptance ..........................................................5

    C. The Court Should Confirm the Plan ........................................................6

        1. The District Has Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)). ..........................................6

        2. The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)). ........................................7

        3. The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)). .........................................9

        4. The Plan Has Been Accepted by All But One of the Classes of Creditors Entitled to Vote on the Plan (11 U.S.C. § 1129(a)(8)). ...............9

        5. The Plan Has Been Accepted by an Impaired Accepting Class (11 U.S.C. § 1129(a)(10)). ...................................................................11

        6. The Plan Does Not Discriminate Unfairly and is Fair & Equitable as to Each Class of Claims That is Has Not Accepted the Plan (11 U.S.C. § 1129(b)). ...............................................................11

        7. The Plan Complies With Sections 103(f) and 901 of the Bankruptcy Code (11 U.S.C. § 943(b)(1)). ..................................................14

        8. The Plan Complies With the Provisions of Chapter 9 (11 U.S.C. § 943(b)(2)). ...................................................................16

        9. Amounts Paid to Debtor's Professionals Are Reasonable (11 U.S.C. § 943(b)(3)). ...................................................................16

        10. The District is Not Prohibited by Law From Taking Any Action Necessary to Carry Out the Plan (11 U.S.C. § 943(b)(4)). .......................17

        11. The Plan Provides for Payment of Administrative Expense Claims (11 U.S.C. § 943(b)(5)). ...............................................................18

        12. The Change in Governance of the District Contemplated by the Plan is Conditioned on Electoral Approval (11 U.S.C. § 943(b)(6)). ...............18

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

104532132\V-3

i

# TABLE OF CONTENTS

13.     The Plan is in the Best Interests of Creditors and is Feasible (11 U.S.C. § 943(b)(7)). ...........................................................................19

D.     The Court Should Overrule the Pending Objections to Confirmation of the Plan.............................................................................................................21

1.     The Ambac Objection ............................................................22

2.     The Trustee Objection ............................................................33

3.     The Cellular Rights Objections .............................................37

III.     CONCLUSION ..........................................................................................42

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

104532132\V-3

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

In re A.H. Robins Co., Inc.,
   163 F.3d 598, 1998 WL 637401 (4th Cir. Aug. 31, 1998)..........................................................7

In re Amicus Windown Corp.,
   2012 Bankr. Lexis 622 (Bankr. D. Del. 2012) ...........................................................38

In re Art & Architecture Books of the 21st Century,
   No. 2:13-BK-14135-RK, 2016 WL 1118743 (Bankr. C.D. Cal. Mar. 18, 2016) ......................39

In re Aztec Co.,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) .............................................................14

In re Baldwin Parke Towne Ctr., Ltd.,
   171 B.R. 374 (Bankr. C.D. Cal. 1994) ...............................................................28

In re Bally Total Fitness of Greater N.Y., Inc.,
   2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ...........................................6

In re Bamberg Cnty. Mem'l Hosp.,
   2012 WL 1890259 (Bankr. D.S.C. May 23, 2012) .............................................19

In re Barakat,
   99 F.3d 1520 (9th Cir. 1996).............................................................28

In re Buttonwood Partners, Ltd.,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990) .............................................................33

In re City of Color Springs Creek Gen. Improvement Dist.,
   187 B.R. 683 (Bankr. D. Colo. 1995) ...........................................................17

In re City of Colorado Springs Spring Creek Gen. Improvement Dist.,
   177 B.R. 684 (Bankr. D. Colo. 1996) .............................................................26

In re City of Columbia Falls, Mont. Special Improvement Dist. No. 25,
   143 B.R. 750 (Bankr. D. Mont. 1992).....................................................17, 34, 36, 37

In re City of Detroit,
   524 B.R. 147 (Bankr. E.D. Mich. 2014) ........................................................23, 35

In re City of Detroit, Mich.,
   504 B.R. 97 (Bankr. E.D. Mich. 2013) ...........................................................35

In re City of Stockton, California,
   542 B.R. 261 (9th Cir. BAP 2015).............................................................23

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

In re Cnty. of Orange,
   191 B.R. 1005 (Bankr. C.D. Cal. 1996) ...................................................................20

In re Cnty. of Orange,
   241 B.R. 212 (C.D. Cal. 1999) ...........................................................................17

In re Connector 2000 Ass'n,
   447 B.R. 752 (Bankr. D.S.C. 2011) .............................................................17, 21

In re Corcoran Hosp. Dist.,
   233 B.R. 449 (Bankr. E.D. Cal. 1999) .........................................................21, 27

In re Coventry Commons Assocs.,
   149 B.R. 109 (Bankr. E.D. Mich. 1992) ..............................................................12

In re: Elephant Bar Rest. Inc.,
   195 B.R. 353 (Bankr. W.D. Pa. 1996) ................................................................38

Gibbons v. Ogden,
   22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) .............................................................41

In re Greystone III Joint Venture,
   995 F.2d 1274, 1279 (5th Cir. 1991) ..................................................................28

Hanson v. First Bank of S. Dakota, NA.,
   828 F.2d 1310 (8th Cir. 1987).............................................................................8

Hewlett v. U.S. Bankr. Court,
   2007 WL 3232239 (Bankr. N.D. Cal. Oct. 31, 2007) ..........................................41

In re Hill,
   307 B.R. 821 (Bankr. W.D. Pa. 2004) ................................................................40

In re Jefferson Cnty.,
   482 B.R. 404 (Bankr. N.D. Ala. 2012).................................................34, 35, 36

Kane v. Johns-Manville Corp.,
   843 F.2d 636 (2d Cir. 1988), cert. denied, 488 U.S. 868 (1988) ............................8

Koelbl v. Glessing (In re Koelbl),
   751 F.2d 137 (2d Cir. 1984)................................................................................8

In re Loop 76, LLC,
   465 B.R. 525 (9th Cir. B.A.P. 2012) ...................................................................29

Lorber v. Vista Irr. Dist.,
   127 F.2d 628.....................................................................................................25

In re: MMH Auto. Grp.,
   385 B.R...........................................................................................................41

104532132\V-3

In re Mount Carbon Metro. Dist.,
   242 B.R. 18 (Bankr. D. Colo. 1999) ....................................................17, 19, 20, 21

In re Ng,
   2007 WL 4365564 (Bankr. N.D. Cal Dec. 13, 2007) ...........................................40

NLRB v. Bildisco and Bildisco,
   465 U.S. 513 (1984) ..............................................................................................8

Pacific Gas & Electric Co. v. California ex rel. California Dept. of Toxic
   Substances.,
   350 F.3d 932 (9th Cir.2003)..................................................................................39

In re Piece Goods Shops Co., L.P.,
   188 B.R. 778 (Bankr. M.D.N.C. 1995) ...................................................................8

In re Pierce Cnty. Hous. Auth.,
   414 B.R. 702 (Bankr. W.D. Wash. 2009) .............................................................19

Precision Indus. v. Qualitech Steel SBQ (In re Qualitech Steel, Corp.) ("Precision
   Indus."),
   327 F.3d 537 (7th Cir. 2003).................................................................................40

Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.),
   429 B.R. 692 (Bankr. S.D. Cal. 2010) ..................................................................20

In re PWS Holding Corp.,
   228 F.3d 224 (3d Cir. 2000)....................................................................................6

In re R.J. Dooley Realty,
   2010 WL 2076959 (S.D. Bankr. May 21, 2010)....................................................41

In re Radco Props., Inc.,
   402 B.R. 666 (Bankr. E.D.N.C. 2009) ....................................................................8

In re Richmond Unif. Sch. Dist.,
   133 B.R. 221 (Bankr. N.D. Cal. 1991)..................................................................27

In re Riddle,
   444. B.R. 681, 686 (Bankr. N.D. Ga. 2011).....................................................32, 33

In re Sanitary & Improvement Dist., No. 7,
   98 B.R. 970 (Bankr. D. Neb. 1989).........................................................19, 20, 35

In re SGL Carbon Corp.,
   200 F.3d 154 (3d Cir. 1999)....................................................................................8

In re Simmons,
   288 B.R. 737 (Bankr. N.D. Tex. 2003) .................................................................14

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*In re Spanish Peaks Holdings II, LLC,*
862 F.3d 1148 (9th Cir. 2017)................................................................39, 40

*In re T-H New Orleans L.P.,*
116 F.3d 790 (5th Cir. 1997)...........................................................................8

*In re Texaco, Inc.,*
84 B.R. 893 (Bankr. S.D.N.Y. 1988)..............................................................6

*In re US Truck Co., Inc.,*
800 F.2d 581 (6th Cir. 1986)........................................................................28

*W. Coast Life Ins. Co. v. Merced Irr. Dist.,*
114 F.2d 654 (9th Cir. 1940), cert. denied, 311 U.S. 718 (1941) ...............25

*In re Woodbrook Assocs.,*
19 F.3d 312 (7th Cir. 1994)..........................................................................28

**Statutes**

11 U.S.C. § 103(f) .............................................................................................14

11 U.S.C. § 105 ...........................................................................................39, 41

11 U.S.C. § 109(b) .............................................................................................19

11 U.S.C. § 109(c) ...............................................................................................5

11 U.S.C. § 330 ..................................................................................................17

11 U.S.C. § 331 ..................................................................................................17

11 U.S.C. § 361 ..................................................................................................41

11 U.S.C. § 362 ..................................................................................................41

11 U.S.C. § 363 ..................................................................................................41

11 U.S.C. § 363(c)–(e) ......................................................................................35

11 U.S.C. § 363(e) .............................................................................................41

11 U.S.C. § 363(f) ........................................................................................40, 41

11 U.S.C. § 364 ..................................................................................................41

11 U.S.C. § 365 ..................................................................................................39

11 U.S.C. § 365(h) .......................................................................................*passim*

11 U.S.C. § 506(c) .............................................................................................35

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

11 U.S.C. § 507(a)(2) ...............................................................................................................18

11 U.S.C. § 901 .......................................................................................................................14

11 U.S.C. § 901(a) ...............................................................................................6, 17, 35, 41

11 U.S.C. § 902(2) ..................................................................................................................34

11 U.S.C. § 922 .......................................................................................................................36

11 U.S.C. § 928 ........................................................................................................33, 35, 36

11 U.S.C. § 928(b) ...................................................................................................3, 35, 36

11 U.S.C. § 941 .......................................................................................................................16

11 U.S.C. § 942 .......................................................................................................................16

11 U.S.C. § 943 .......................................................................................................................35

11 U.S.C. § 943(b) ...........................................................................................................passim

11 U.S.C. § 943(b)(2) ..............................................................................................................16

11 U.S.C. § 943(b)(3) .......................................................................................................16, 17

11 U.S.C. § 943(b)(4) .......................................................................................................passim

11 U.S.C. § 943(b)(5) ..............................................................................................................18

11 U.S.C. § 943(b)(6) .......................................................................................................18, 19

11 U.S.C. § 943(b)(7) ..............................................................................................................19

11 U.S.C. § 944 .......................................................................................................................36

11 U.S.C. § 1122 ..............................................................................................................14, 28

11 U.S.C. § 1122(b) ................................................................................................................28

11 U.S.C. § 1123 .....................................................................................................................24

11 U.S.C. § 1123(a)(1)-(5) ...............................................................................................14, 15

11 U.S.C. § 1123(a)(1)-(5) ......................................................................................................14

11 U.S.C. § 1123(a)(5) ............................................................................................................39

11 U.S.C. § 1123(a)(5)(D) ...........................................................................................38, 39, 41

11 U.S.C. § 1123(a)(5)(E) ................................................................................................13, 24

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

11 U.S.C. § 1123(a)(5)(F) ...................................................................................13, 24, 26

11 U.S.C § 1123(b) .........................................................................................13, 14, 41

11 U.S.C. § 1123(b)(4) ..............................................................................................39

11 U.S.C. § 1123(d) ...................................................................................................14

11 U.S.C. § 1124 ..............................................................................................9, 14, 15

11 U.S.C. § 1125 .........................................................................................6, 7, 14, 15

11 U.S.C. § 1125(e) .....................................................................................................7

11 U.S.C. § 1126 ..........................................................................................................7

11 U.S.C. § 1126(a)-(c) ........................................................................................14, 15

11 U.S.C. § 1126(c) ........................................................................................9, 10, 15

11 U.S.C. § 1126(e)-(g) .......................................................................................14, 15

11 U.S.C. § 1127(d) .......................................................................................14, 15, 16

11 U.S.C. § 1128 ........................................................................................................14

11 U.S.C. §1129 ...................................................................................................14, 35

11 U.S.C. § 1129(a) ........................................................................................6, 11, 14

11 U.S.C. § 1129(a)(2) .................................................................................................6

11 U.S.C. § 1129(a)(3) .............................................................................................6, 8

11 U.S.C. § 1129(a)(6) .............................................................................................6, 9

11 U.S.C. § 1129(a)(8) .......................................................................................6, 9, 11

11 U.S.C. § 1129(a)(10) ........................................................................................6, 11

11 U.S.C. §1129(b) ............................................................................................ *passim*

11 U.S.C. § 1129(b)(1) ......................................................................................12, 14

11 U.S.C. § 1129(b)(2) ......................................................................................12, 14

11 U.S.C § 1129(b)(2)(A)(i) .............................................................................. *passim*

11 U.S.C. § 1129(b)(2)(A)(i)(I) .........................................................................25, 30

11 U.S.C. § 1129(b)(2)(A)(i)(I)-(II) .................................................................12, 13

28 U.S.C. § 157(b)(2) ................................................................................................................5

28 U.S.C. § 1334 .......................................................................................................................5

28 U.S.C. § 1408 .......................................................................................................................5

28 U.S.C. § 1409 .......................................................................................................................5

California Government Code Section 5451.5 .....................................................................33, 34

**Other Authorities**

Bankruptcy Rule 2002 ...............................................................................................................5

Bankruptcy Rule 3017 ...........................................................................................................5, 7

Bankruptcy Rule 3018 ...........................................................................................................5, 7

Bankruptcy Rule 6004 ...............................................................................................................5

Bankruptcy Rule 6006 ...............................................................................................................5

Bankruptcy Rule 9007 ...............................................................................................................5

Bankruptcy Rule 9014 ...............................................................................................................5

4 COLLIER ON BANKRUPTCY ¶ 943.03[7] (15th ed.) ................................................................20

6 COLLIER ON BANKRUPTCY ¶ 943.03[1] ................................................................................14

7 COLLIER ON BANKRUPTCY ¶ 1123.01[5] ..............................................................................39

100 Marq. L. Rev. 295, 316 (2016) ..........................................................................................40

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The West Contra Costa Healthcare District, a California Local Health Care District and the debtor in the above-captioned Chapter 9 case (the "District"), hereby submits this Memorandum of Law (this "Memorandum") in support of confirmation of the *First Amended Plan for the Adjustment of Debts dated July 21, 2017* [Docket No. 126] (the "Plan").

In further support of confirmation of the Plan, the District has filed, and relies upon, the following:

1. The *Declaration of Gary W. Marsh re: Plan Ballot Summary and in Support of Confirmation of First Amended Plan of Adjustment Dated July 21, 2017* [Docket No. 199] (the "Ballot Report");

2. The *Declaration of John Troughton in Support of First Amended Plan of Adjustment* [Docket No. 198] (the "Troughton Declaration");

3. The *Declaration of Michael Gorczynski in Support of Plan of Adjustment* [Docket No. 197] (the "Gorczynski Declaration");

4. The *Declaration of Harold Emahiser in Support of First Amended Plan of Adjustment* [Docket No. 195] (the "Emahiser Declaration");

5. The *Declaration of Kathy White in Support of First Amended Plan of Adjustment* [Docket No. 207] (the "White Declaration"); and

6. The *Declaration of Harjt S. Nahal in Support of First Amended Plan of Adjustment* [Docket No. 196] (the "Nahal Declaration", together with the Troughton Declaration, Gorczynski Declaration, Emahiser Declaration, and White Declaration, the "Confirmation Declarations").

The District also requests that the Court take judicial notice of the extensive docket of the Case maintained by the Clerk of the Court, including, without limitation, all pleadings, all documents and declarations filed, all proofs of claims filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before this Court during the pendency of the Case.

In support of confirmation of the Plan, the District respectfully shows the Court as follows:

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# I.     <u>BACKGROUND</u>

A.     <u>Events Leading Up to the Filing of the Chapter 9 Case</u>

The District is a public agency formed in 1948 under the State of California Local Healthcare District Law. In 1954, the District completed construction of a Hospital to serve the people of Hercules, El Sobrante, Richmond, North Richmond, East Richmond Heights, Kensington, Pinole, Rodeo, El Cerrito, Crockett, and San Pablo, then known as Brookside Hospital.

The District operated the Hospital at a significant annual loss. In 2004, with the Hospital running out of cash and closure of the Hospital imminent, the District introduced a special parcel tax measure (Measure D) to supplement the existing ad valorem property tax, which measure was approved by 84% of voting residents in June 2004. Immediately thereafter the District used the future proceeds from that new parcel tax to secure $26 million in long-term municipal bond financing through the sale of the 2004 COPs.[1] The proceeds of the 2004 COPs were used to provide general working capital to the District and to cover continuing losses at the Hospital.

Despite the issuance of the 2004 COPs, the District continued to struggle. The Hospital posted a $22.9 million operating loss in 2005, which loss consumed almost all of the cash reserve created by the 2004 COPs. Facing a projected deficit of $35 million by the end of 2006, the District filed for bankruptcy on October 1, 2006, commencing Chapter 9 case number 06-41774.

During the pendency of the bankruptcy case, the District developed and implemented a plan to achieve more than $17 million in expense reductions and performance improvements. The District secured additional outside funding and emerged from bankruptcy in 2008.

By 2011, the outside funding secured during the prior bankruptcy case was reduced by 93% and the District again faced a significant financial shortfall. The District again worked to cut expenses and proposed a new, additional parcel tax (Measure J) that was approved by the voters by a vote of 74%. The District used the future proceeds from this new parcel tax to secure an

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

104532132\V-3

additional $35 million in long-term municipal financing through the 2011 COPs. The proceeds of the 2011 COPs were used to refinance a portion of the 2004 COPs and to fund general operating expenses of the District.

With the Hospital continuing to lose money and the District unable to secure additional financing, the District made the difficult decision to shut down operations at the Hospital effective April 21, 2015. By October 2016, the revenues obtained by the District through the 2011 COPs had been almost completely exhausted. Despite the District's best efforts, the District was unable to close a sale of the Hospital to provide funds needed by the District on terms acceptable to the District. In October 2016, with no funds to continue operations or pay creditors, the District filed this Chapter 9 Case (the "Chapter 9 Case").

**B.     The Chapter 9 Case**

On October 20, 2016 (the "Petition Date"), the District filed a voluntary petition under chapter 9 of the Bankruptcy Code (the "Petition") commencing the Chapter 9 Case. On January 11, 2017, the Court entered an Order for Relief, *nunc pro tunc* to the Petition Date. [Docket No. 61] (the "Order for Relief"). On March 21, 2017, the United States Trustee appointed the official committee of unsecured creditors in the Chapter 9 Case (the "Committee").

During the pendency of the Chapter 9 Case, the District obtained Orders excusing the appointment of a Patient Care Ombudsman [Docket No. 63], permitting the destruction of patient records [Docket No. 79], and approving the assumption of the District's headquarters lease [Docket No. 93]. The District also sought and obtained an order pursuant to Section 928(b) of the Bankruptcy Code to allow the District to use the Parcel Tax proceeds to fund its operations during the pendency of the Chapter 9 Case [Docket No. 62].

Throughout the Chapter 9 Case, the District has sought to close on the sale of the Hospital to LRC. Those efforts have been largely frustrated by the refusal of the Cellular Rights Parties to consent to the removal of the Cell Boxes and allow the sale free and clear of their rights. As addressed in more detail in Section II.D.3 of this Brief, the District has now reached a negotiated settlement with Crown Castle that, if approved by the Court, would allow for the sale of the

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Case: 16-42917    Doc# 209    Filed: 09/28/17    Entered: 09/28/17 12:24:18    Page 13 of 52
104532132\V-3

Hospital free and clear of their rights. The District has not, however, reached a negotiated agreement with Verizon or AT&T as of the date this brief is filed. The District therefore seeks to sell the Hospital free and clear of the rights of Verizon and AT&T pursuant to the Plan, as discussed in Section II.D.3 of this Brief.

### C. The Plan & Disclosure Statement

The District filed the Plan and the *First Amended Disclosure Statement for Plan for the Adjustment of Debts dated July 21, 2017* [Docket No. 127] on July 21, 2017 (as amended on August 3, 2017 [Docket No. 146], the "Disclosure Statement"). The Plan is the product of extensive negotiations with various parties in interest, including the Committee. The Plan provides for the sale of the Hospital, the restructuring of the District's secured and unsecured indebtedness, and the repayment of creditors. The Plan further provides for the reorganization of the District and, if confirmed, would allow the District to resume providing critical health care services to the citizens of West Contra Costa County.

Following a hearing on July 25, 2017, to consider the adequacy of the Disclosure Statement, the Court entered an order on August 7, 2017 [Docket No. 148] (the "Disclosure Statement Order"): (1) approving the Disclosure Statement; (2) setting October 12 and 13, 2017, as the date of the hearing on confirmation of the Plan (the "Confirmation Hearing"); (3) setting deadlines to vote on and object to the Plan; and (4) approving various procedures for soliciting votes on the Plan (the "Solicitation Procedures"). As set forth in the various certificates of service that are on file with the Court, the District has fully complied with the Solicitation Procedures set forth in the Disclosure Statement Order. On September 25, 2017, the District filed the Ballot Report reflecting that Classes 2, 4, 5, 6, and 7 have voted to accept the Plan, that Class 3, as unimpaired, is deemed to have accepted the Plan, and that Class 1 has rejected the Plan.

The District believes that the Plan provides the best opportunity for a restructured District to sell the Hospital, restructure its indebtedness, repay its creditors, and resume providing critical health care services to the citizens of West Contra Costa County and is in the best interests of all parties in interest in this Chapter 9 Case. The Plan is the result of extensive consultations and

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

negotiations with the Committee and most of the other major creditors. The Committee supports the Plan and the major constituents in this Chapter 9 Case have voted overwhelmingly in favor of the Plan. The Plan complies with all applicable provisions of the Bankruptcy Code. For the reasons set forth in this Memorandum, the Court should confirm the Plan.

## II. ARGUMENT

### A. Jurisdiction & Venue

The Bankruptcy Court has jurisdiction over this Case pursuant to 28 U.S.C. § 1334. Venue in the Bankruptcy Court is proper under 28 U.S.C. §§ 1408 and 1409. The District is qualified to be a debtor under Section 109(c) of the Bankruptcy Code, as confirmed by the Court in the Order for Relief entered on January 11, 2017. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2) and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

### B. Notice, Solicitation & Acceptance

In accordance with the Disclosure Statement Order and Bankruptcy Rule 3017(d), all appropriate pleadings, notices, and ballots were transmitted to the appropriate parties on or about August 9, 2017, all as evidenced by the Affidavit of Service filed by the District on August 17, 2017 [Docket No. 150]. On September 25, 2017, the District filed the Ballot Report reflecting that Classes 2, 4, 5, 6, and 7 have voted to accept the Plan, that Class 3, as unimpaired, is deemed to have accepted the Plan, and that Class 1 has rejected the Plan.

In accordance with the Disclosure Statement Order and Bankruptcy Rules 2002, 3018, 6004, 6006, 9007, and 9014, adequate notice of the time for filing objections to Confirmation of the Plan and the transactions contemplated thereby and adequate notice of the Confirmation Hearing and the assumption of executory contracts and unexpired leases set forth in the Schedule of Assumed Contracts (as supplemented, amended, and modified) (collectively, the "Assumed Contracts") and related cure amounts were provided to all holders of Claims, counterparties to the Assumed Contracts, and other parties in interest entitled to receive such notice under the

Bankruptcy Code and Bankruptcy Rules. No other or further notice of the Confirmation Hearing or Confirmation of the Plan is necessary or required by law.

### C.    The Court Should Confirm the Plan

The plan proponent bears the burden of proving each applicable element of 11 U.S.C. § 1129(a) by a preponderance of the evidence. *See In re Bally Total Fitness of Greater N.Y., Inc.*, 2007 WL 2779438, *3 (Bankr. S.D.N.Y. Sept. 17, 2007). Section 901(a) of the Bankruptcy Code provides that the following sections of 11 U.S.C. § 1129(a) are applicable to Chapter 9 cases: 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), and 1129(a)(10). In addition, Section 943(b) of the Bankruptcy Code imposes additional requirements for the confirmation of a plan of adjustment in a Chapter 9 case.

As set forth below and as will be demonstrated at the Confirmation Hearing, the Plan complies with all applicable elements of Section 1129(a) and all elements of Section 943(b), as well as the Bankruptcy Rules and applicable non-bankruptcy law. As further set forth below, as to Class 1, which has voted to reject the Plan, the Plan complies with all applicable elements of Section 1129(b) of the Bankruptcy Code. The Court should therefore confirm the Plan.

### 1.    The District Has Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).

The first subsection of Section 1129(a) of the Bankruptcy Code applicable to this Chapter 9 case is 11 U.S.C. § 1129(a)(2), which requires that the proponent of a plan comply with the applicable provisions of the Bankruptcy Code. The purpose of Bankruptcy Code § 1129(a)(2) is to ensure, among other things, that plan proponents have complied with Section 1125 of the Bankruptcy Code in the solicitation of acceptances to the plan. *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) (Bankruptcy Code § 1129(a)(2) requires that a plan proponent comply with the adequate disclosure requirements of Bankruptcy Code § 1125); *In re Texaco, Inc.*, 84 B.R. 893, 903 (Bankr. S.D.N.Y. 1988).

Section 1125 prohibits the solicitation of acceptances or rejections of a plan of reorganization from a holder of a claim "unless at the time of or before such solicitation, there is

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." The purpose of Bankruptcy Code section 1125 is to ensure that sufficient information is provided such that a reasonable, typical creditor may make an informed judgment about the merits of a proposed plan, and the Court "must assess the disclosure statement's adequacy and approve it before transmittal." *See In re A.H. Robins Co., Inc.*, 163 F.3d 598, 1998 WL 637401, at *3 (4th Cir. Aug. 31, 1998). Here, Debtor has satisfied the requirements of section 1125 of the Bankruptcy Code. On August 8, 2017, the Bankruptcy Court determined that the District's Disclosure Statement and solicitation and related procedures were adequate and entered its Disclosure Statement Order.

Additionally, Bankruptcy Code section 1125(e) requires that solicitation of acceptance or rejection of a plan must be in good faith. The solicitation procedures utilized by the District in this case were developed jointly with the Committee, the Trustee, and Ambac and were the result of extensive discussions. Based on the record, the District has acted in "good faith" within the meaning of Bankruptcy Code section 1125(e) and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Order, and applicable non-bankruptcy law in connection with all of its respective activities relating to: (1) the solicitation of acceptances or rejections of the Plan; and (2) its participation in the other activities described in Bankruptcy Code section 1125.

The District solicited votes for acceptance or rejection of the Plan in good faith and in compliance with Bankruptcy Code sections 1125 and 1126, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations. In addition, all procedures used to distribute solicitation packages to holders of Claims were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws and regulations. Therefore, the District should be entitled to the full protections afforded by Bankruptcy Code section 1125(e).

**2.** **The Plan Has Been Proposed in Good Faith and Not by Any Means**

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**Forbidden by Law (11 U.S.C. § 1129(a)(3)).**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." Good faith has a specific meaning in the context of § 1129(a)(3): good faith means that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988), cert. denied, 488 U.S. 868 (1988) (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)); *accord In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (finding that good faith requires "some relation" between the plan and the "reorganization-related purposes" of the Bankruptcy Code); *In re T-H New Orleans L.P.*, 116 F.3d 790, 802 (5th Cir. 1997) (good faith inquiry involves a totality of circumstances analysis, "keeping in mind the purpose of the [Bankruptcy Code] is to give debtors a reasonable opportunity to make a fresh start").

"Generally, a plan is proposed in good faith if there is a reasonable likelihood that it will achieve a result consistent with the goals of the Bankruptcy Code." *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995) (citing *Hanson v. First Bank of S. Dakota, NA.*, 828 F.2d 1310 (8th Cir. 1987)); *accord NLRB v. Bildisco and Bildisco*, 465 U.S. 513 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."). "In order to determine if a plan has been filed in good faith, a court should consider the totality of the circumstances." *In re Radco Props., Inc.*, 402 B.R. 666, 673 (Bankr. E.D.N.C. 2009) (citing *In re Piece Goods Shops Co., L.P.*, 188 B.R. at 790).

Here, the Plan has been proposed in good faith as evidenced by the fact that the Plan allows a restructured District to sell the Hospital, restructure its indebtedness, repay its creditors, and resume providing critical health care services to the citizens of West Contra Costa County. The Plan is the result of extensive consultations and negotiations with the Committee, the Committee supports the Plan, and the major constituents in this Chapter 9 case have voted overwhelmingly in favor of the Plan. The Plan complies with all applicable provisions of the

Case: 16-42917   Doc# 209   Filed: 09/28/17   Entered: 09/28/17 12:24:18   Page 18 of 52
104532132\V-3

Bankruptcy Code. Therefore, the Plan has been proposed in good faith, as interpreted under the Bankruptcy Code, and will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

### 3. The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)).

Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that will have jurisdiction over the District after confirmation has approved any rate change provided for in the plan. While Section 1129(a)(6) is generally applicable to Chapter 9 cases, it is inapplicable to this Chapter 9 Case because the Plan does not propose any rate changes and the District does not charge any rates.

### 4. The Plan Has Been Accepted by All But One of the Classes of Creditors Entitled to Vote on the Plan (11 U.S.C. § 1129(a)(8)).

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. To the extent any class of claims or interest is impaired under a plan but rejects the plan, the plan may only be confirmed under the "cram down" requirements of Section 1129(b) of the Bankruptcy Code.

Pursuant to section 1126(c), a class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims in that class that voted actually vote to accept the plan. A class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan. On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests.

The Plan divides claims against the District into seven classes. Claims in Classes 1, 2, 4, 5, 6 and 7 are impaired as defined in Section 1124 of the Bankruptcy Code. Class 3 is unimpaired under the Plan and is conclusively presumed to have accepted the Plan.

<u>Class 1</u> – <u>Secured Claims of the COPs Holders</u>. Class 1 consists of the secured claims of

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

the COPs Holders in the amount of $55,990,000.00.  Of the 11 Class 1 Ballots received by the Voting Deadline, 8 voted to accept the Plan and 3 voted to reject the Plan; thus, 73% of the ballots cast by number in Class 1 voted to accept the Plan and 27% of the ballots cast by number in Class 1 voted to reject the Plan.  By dollar amount, of the $1,615,000.00 in Class 1 Ballots received by the Voting Deadline, $530,000.00 voted to accept the Plan and $1,085,000.00 voted to reject the Plan; thus, 33% of the ballots cast by dollar amount in Class 1 voted to accept the Plan and 67% of the ballots cast by dollar amount in Class 1 voted to reject the Plan, resulting in a rejection of the Plan by Class 1.  See 11 U.S.C. § 1126(c).  Because the COPs Holders did not vote in favor of the Plan, the Plan can be confirmed only if it meets the cramdown requirements of Section 1129(b) of the Bankruptcy Code as to the COPs Holders.  As set forth below, the Plan satisfies the Section 1129(b) of the Bankruptcy Code as to the COPs Holders.

Class 2 – Claims of the County.  Class 2 consists of the unsecured claim of the County in the amount of $436,265.01 and the County's rights under the Tax Sharing Agreements.  The County voted in favor of the Plan.  Therefore, more than one half in number of claims voting in Class 2 representing more than two-thirds in amount of claims voting in Class 2 have voted to accept the Plan.

Class 4 – CNA Claim.  Class 4 consists of the unsecured claim of CNA in the amount of $5,119,006.00.  CNA voted in favor of the Plan.  Therefore, more than one half in number of claims voting in Class 4 representing more than two-thirds in amount of claims voting in Class 4 have voted to accept the Plan.

Class 5 – General Unsecured Claims.  Class 5 consists of all Allowed Unsecured Claims against the District other than claims held by the County, EDD, Local 39 (other than Local 39's Class 5 Claim), CNA, and holders of WCCHD Successor Pension Claims.  Of the 33 Class 5 ballots received by the Voting Deadline, 32 voted to accept the Plan and 1 voted to reject the Plan; thus, 97% of the votes cast by number in Class 5 voted to accept the Plan and 3% of the votes cast by number in Class 5 voted to reject the Plan.  By dollar amount, of the $13,486,966.12 in Class 5 Ballots received by the Voting Deadline, $13,451,966.12 voted to accept the Plan and $35,000

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

voted to reject the Plan; thus, 99.74% of the votes cast by dollar amount in Class 5 voted to accept the Plan and 0.26% of the votes cast by dollar amount in Class 5 voted to reject the Plan. Therefore, more than one half in number of claims voting in Class 5 representing more than two-thirds in amount of claims voting in Class 5 have voted to accept the Plan.

Class 6 – <u>EDD Claim</u>. Class 6 consists of the claim of EDD, filed by EDD as a priority unsecured claim in the amount of $1,664,785.23. EDD voted in favor of the Plan. Therefore, more than one half in number of claims voting in Class 6 representing more than two-thirds in amount of claims voting in Class 6 have voted to accept the Plan.

Class 7 – <u>Local 39</u>. Class 7 consists of the claim of Local 39, filed by Local 39 as a general unsecured claim in the amount of $483,691.11. Local 39 voted in favor of the Plan. Therefore, more than one half in number of claims voting in Class 7 representing more than two-thirds in amount of claims voting in Class 7 have voted to accept the Plan.

## 5. The Plan Has Been Accepted by an Impaired Accepting Class (11 U.S.C. § 1129(a)(10)).

Section 1129(a)(10) of the Bankruptcy Code is an alternative requirement to the requirement under Bankruptcy Code section 1129(a)(8) that each class of Claims or Interests must either accept the plan or be unimpaired under the plan. Section 1129(a)(10) provides that to the extent there is an impaired Class of Claims at least one impaired Class of Claims must accept the plan, excluding acceptance by any insider. As shown above, Classes 2, 4, 5, 6, and 7 voted to accept the Plan. Therefore, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

## 6. The Plan Does Not Discriminate Unfairly and is Fair & Equitable as to Each Class of Claims That is Has Not Accepted the Plan (11 U.S.C. § 1129(b)).

Section 1129(b) of the Bankruptcy Code provides that, if all applicable requirements of Section 1129(a) are met save for 1129(a)(8) (that all classes entitled to vote have voted to accept

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

the Plan), then the plan may only be confirmed if, as to each class that has voted to reject the Plan, the Plan is "fair and equitable" and does not "discriminate unfairly". 11 U.S.C. § 1129(b)(1).

Here, the only class that has voted to reject the Plan is Class 1 - the secured claims of the COPs Holders in the amount of $55,990,000.00. The Plan may therefore be confirmed only if it is fair and equitable as to Class 1 and does not discriminate unfairly as to Class 1.

### a. *The Plan is Fair and Equitable as to Class 1*

Section 1129(b)(2) of the Bankruptcy Code provides that "[f]or purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes" certain enumerated, disjunctive requirements. 11 U.S.C. § 1129(b)(2). "With respect to a class of secured claims," a plan satisfies the statutory "fair and equitable" requirement if such plan provides as follows:

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receiver on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]

11 U.S.C. § 1129(b)(2)(A)(i)(I)-(II). Section 1129(b)(2)(A)(i) of the Bankruptcy Code thus provides that a secured creditor is "entitled to retain its lien and to receive property with a present value equal to the allowed amount of its claim." *In re Coventry Commons Assocs.*, 149 B.R. 109, 115 (Bankr. E.D. Mich. 1992). Here, the Plan provides that "[t]he Trustee and COPs Holders shall retain their lien on the Parcel Tax Revenues in order to secure the Reorganized District's payment obligations under the Plan" and that "[t]he secured claims of the COPs Holders shall be paid in full with interest under the Plan." (Plan § 4.1). The Plan thus satisfies Section 1129(b)(2)(A)(i) of the Bankruptcy Code and is therefore "fair and equitable" with respect to the

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Trustee because it provides that: (1) the Trustee will retain its lien on the Parcel Tax revenues; and (2) the COPs Holders will receive the present value, as of the Effective Date, of such claims.

Although secured creditors such as the Trustee must retain their liens and receive the present value of their claims under Section 1129(b)(2)(A)(i) of the Bankruptcy Code, the Plan need not avoid impairing secured claims altogether to satisfy the "fair and equitable" requirement. Rather, the Bankruptcy Code expressly permits the impairment of secured claims. Section 1123(b) of the Bankruptcy Code provides as follows:

Subject to subsection (a) of this section, a plan may -

(1) impair or leave unimpaired any class of claims, secured or unsecured;

…

(5) *modify the rights of holders of secured claims ...*

(6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

11 U.S.C. § 1123(b)(1), (5), (6) (emphasis added).

Also, pursuant to Section 1123(a)(5)(E) and (F), a plan may propose a modification of any lien or indenture or similar instrument.

With respect to the requirement that the COPs Holders will receive the present value, as of the Effective Date, of the amount of their secured claims, the Plan pays the COPs Holders in full at the contractual rate of interest when such payments are due under the COPs Documents. Save for the elimination of mandatory prepayment rights, the Plan leaves contractual payment dates and interest rates unaltered. As set forth in the Emahiser Declaration, the average remaining interest rate on the 2004 COPs is 5.46% and the average remaining interest rate on the 2011 COPs is 6.04%, and such rates are above market. (Emahiser Declaration at 12-14) Neither the Trustee nor Ambac has objected to the interest rate proposed to be paid to the COPs Holders under the Plan. The Plan is thus fair and equitable to Class 1 under Section 1129(b)(2)(A)(i)(I)-(II) of the Bankruptcy Code.

b. *The Plan Does Not Discriminate Unfairly Against Class 1*

In order to be confirmed without the acceptance of Class 1, in addition to being fair and equitable as to Class 1, the Plan must also not discriminate unfairly against Class 1. 11 U.S.C. § 1129(b)(1). By its terms, Section 1129(b)(1) of the Bankruptcy Code "prohibits only *unfair* discrimination, not all discrimination." *In re Aztec Co.*, 107 B.R. 585, 588-89 (Bankr. M.D. Tenn. 1989) (emphasis added). Indeed, it is "necessarily inherent in the term 'unfair discrimination' . . . that there may be 'fair' discrimination in the treatment of classes of creditors." *In re Simmons*, 288 B.R. 737, 747-48 (Bankr. N.D. Tex. 2003) (citation omitted).

Here, the COPs Holders are being paid in full, with interest, at their stated maturity dates. Moreover, the Trustee's lien on the Parcel Tax revenues is being fully preserved under the Plan. The Plan therefore cannot be said to discriminate unfairly against Class 1.

> **7.    The Plan Complies With Sections 103(f) and 901 of the Bankruptcy Code (11 U.S.C. § 943(b)(1)).**

In addition to satisfying certain applicable requirements of Section 1129 of the Bankruptcy Code, Section 943(b) of the Bankruptcy Code imposes seven additional requirements for the confirmation of a plan of adjustment in a Chapter 9 case. The first of these seven additional requirements is that the Plan comply with provisions of the Bankruptcy Code made applicable to Chapter 9 cases by Sections 103(f) and 901 of the Bankruptcy Code.

Section 901 of the Bankruptcy Code incorporates into Chapter 9 the following Chapter 11 provisions relevant to plan confirmation: Sections 1122, 1123(a)(1)-(5), 1123(b), 1123(d), 1125, 1126(a)-(c) and (e)-(g), 1127(d), 1128, those provisions of Section 1129(a) addressed above, 1129(b)(1), and 1129(b)(2)(A)-(B) (the "Incorporated Provisions"). "[T]he most important of these for purposes of confirming a plan are those provisions of section 1129 . . . that are made applicable in chapter 9 cases." 6 COLLIER ON BANKRUPTCY ¶ 943.03[1]. As demonstrated above, all elements of Section 1129 of the Bankruptcy Code applicable to the Chapter 9 Case have been satisfied. In addition to Section 1129 of the Bankruptcy Code, the following Incorporated Provisions are relevant to confirmation of a Chapter 9 plan: § 1123(a)(1)-(5) (governing mandatory contents of a plan); § 1124 (impairment of claims); § 1125 (postpetition disclosure and

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

solicitation); § 1126(a)-(c), (e)-(g) (acceptance of plan); and § 1127(d) (modification of plan). Id. Each of these Incorporated Provisions is addressed below.

Section 1123(a)(1)-(5) of the Bankruptcy Code sets forth five mandatory requirements that must be met in order to confirm a plan. They require that a plan:

1. designate classes of claims and interests;
2. specify unimpaired classes of claims and interests;
3. specify treatment of impaired classes of claims and interests;
4. provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest; and
5. provide adequate means for the plan's implementation.

11 U.S.C. § 1123(a)(1)-(5). Here, subsections (1) – (4) are satisfied because Articles II, III and IV of the Plan provide for classification, treatment, and voting rights of Claims, and provide for the same treatment for each Claim within a particular class. Subsection (5) is met because Article VI of the Plan includes multiple provisions providing for the implementation of the Plan.

Section 1124 of the Bankruptcy Code governs impairment of creditors and provides standards for determining whether a class of claims or interests is impaired or unimpaired. The Plan complies with Section 1124 by treating Classes 1, 2, 4, 5, 6, and 7 as impaired classes and Class 3 as an unimpaired class in accordance with Section 1124.

Section 1125 of the Bankruptcy Code governs postpetition disclosure and solicitation. As detailed in Section II.C.1. of this Memorandum, the Plan complies with Section 1125.

Section 1126(a)-(c), (e)-(g) governs acceptance of a plan. Pursuant to section 1126(c), a class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims in that class actually vote to accept the plan. A class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan. On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests. As detailed in Section II.C.4. of this Memorandum, the Plan complies with Section 1125.

The final Incorporated Provision relevant to confirmation of a Chapter 9 plan is Section 1127(d) of the Bankruptcy Code, governing post-solicitation modifications of a plan. At the suggestion of a number of creditors and parties in interest, the District has made and is in the process of making further technical modifications to the Plan after entry of the Disclosure Statement Order (the "Modifications"). The Modifications are not material, do not adversely affect the treatment of any creditors, and will be presented and explained to the Court at the Confirmation Hearing. The requirements of Section 1127(d) of the Bankruptcy Code are therefore satisfied.

### 8. The Plan Complies With the Provisions of Chapter 9 (11 U.S.C. § 943(b)(2)).

Section 943(b)(2) of the Bankruptcy Code provides that the Court shall confirm a plan of adjustment if "the plan complies with the provisions of this chapter." Chapter 9 contains two provisions relevant to plan confirmation: Section 941 (regarding filing a plan of adjustment) and Section 942 (regarding plan modifications). Section 941 states simply that "[t]he debtor shall file a plan for the adjustment of the debtor's debts." Debtor satisfied that requirement by filing the Plan. Section 942 governs modifications of the Plan and states a debtor may modify its plan at any time before confirmation unless the plan as modified fails to meet the requirements of Chapter 9. Any modifications to the Plan that the District files will not be material and will not bring the Plan out of compliance with Chapter 9. Section 942 of the Bankruptcy Code is therefore also satisfied.

### 9. Amounts Paid to Debtor's Professionals Are Reasonable (11 U.S.C. § 943(b)(3)).

Section 943(b)(3) of the Bankruptcy Code provides the Court shall confirm a plan of adjustment if "all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable." With respect to disclosure, the District disclosed all amounts paid or to be paid by Debtor to its professionals in the Disclosure Statement. With respect to the reasonableness of fees incurred by Debtor, Section

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

943(b)(3) does not impose on a Chapter 9 debtor and its professionals the standards imposed by Sections 330 and 331 of the Bankruptcy Code for court approval of payment of compensation to a Chapter 11 debtor's professionals and committee. *See* 11 U.S.C. § 901(a) (not incorporating Sections 330 or 331 into Chapter 9); *In re Cnty. of Orange*, 241 B.R. 212, 216 (C.D. Cal. 1999) (Section 330 of the Bankruptcy Code does not apply in a Chapter 9 case).

While the Court does not review and approve the payment of professional fees in a Chapter 9 case, the Court must make a finding in connection with plan confirmation that such fees are fully disclosed and reasonable. This requirement is generally non-controversial, and in most Chapter 9 cases courts have found that the requirement is easily satisfied. *See*, *e.g.*, *In re Connector 2000 Ass'n*, 447 B.R. 752, 764-65 (Bankr. D.S.C. 2011) (Section 943(b)(3) was satisfied where debtor disclosed fees in plan confirmation brief); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 29 (Bankr. D. Colo. 1999) (compliance with Section 943(b)(3) was undisputed); *In re City of Color Springs Creek Gen. Improvement Dist.*, 187 B.R. 683, 685-86 (Bankr. D. Colo. 1995) (Section 943(b)(3) was satisfied where debtor submitted summary of its time and billing records).

The District has fully disclosed the fees and expenses paid or to be paid to all professionals in the Chapter 9 Case and under the Plan. This information has been provided publicly on the docket in this case such that any party in interest can review them and object to it. The Court is able to review these fees and expenses and the District has provided sufficient information and disclosure for the Court to make a finding that such fees and expenses are reasonable. The District has therefore complied with Section 943(b)(3) of the Bankruptcy Code.

### 10. The District is Not Prohibited by Law From Taking Any Action Necessary to Carry Out the Plan (11 U.S.C. § 943(b)(4)).

Section 943(b)(4) of the Bankruptcy Code provides that the Court shall confirm a plan of adjustment if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." This requirement is prospective and applies only to post-confirmation actions proposed in a plan of adjustment; it does not restrict a debtor's ability to impair claims pursuant to a plan. *See In re City of Columbia Falls, Mont. Special Improvement Dist. No. 25*, 143 B.R. 750, 760 (Bankr. D.

17

Mont. 1992) ("Section 943(b)(4) does not prevent the debtors from proposing a plan that impairs the rights of [creditors]. This provision applies to postpetition actions after confirmation of the plan.").

Here, the Plan provides for the repayment of the District's debts and the eventual return to the provision of healthcare services. The Plan provides for a sale of the Hospital in accordance with state law. The Plan also provides for a change in the District's governance through special legislation to be sponsored by the County and enacted by the legislature. The District is therefore not prohibited by law from carrying out the Plan, and Section 943(b)(4) of the Bankruptcy Code is satisfied.

### 11. The Plan Provides for Payment of Administrative Expense Claims (11 U.S.C. § 943(b)(5)).

Section 943(b)(5) of the Bankruptcy Code provides the Court shall confirm a plan of adjustment if the plan provides that holders of administrative expense claims allowable under Section 507(a)(2) of the Bankruptcy Code will be paid in full in cash, unless such holders have agreed to a different treatment. Here, Article III of the Plan clearly provides that all administrative expense claims will be paid in full in cash on the effective date unless the holder of the claim agrees to some other treatment. The Plan therefore satisfies Section 943(b)(5) of the Bankruptcy Code.

### 12. The Change in Governance of the District Contemplated by the Plan is Conditioned on Electoral Approval (11 U.S.C. § 943(b)(6)).

Section 943(b)(6) of the Bankruptcy Code provides the Court shall confirm a plan of adjustment if "any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval." Here, no provision of the Plan requires regulatory approval. The only provision of the Plan that requires electoral approval is the proposed change in governance of the District that would replace the District board elections and an elected board with a governing board appointed by the County Board of Supervisors. (Plan § 5.2). The change in governance is

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

expressly conditioned on electoral approval. In the event electoral approval were not obtained, the District would continue to be governed by its Board of Directors. The Plan therefore satisfies Section 943(b)(6) of the Bankruptcy Code.

**13. The Plan is in the Best Interests of Creditors and is Feasible (11 U.S.C. § 943(b)(7)).**

The final subsection of Section 943(b) that the District must satisfy to obtain confirmation of the Plan is Section 943(b)(7), which states that the Court must confirm the Plan if it is in the best interests of creditors and is feasible.

Unlike in a Chapter 11 case, the "best interests of creditors" test in a Chapter 9 case does not involve a simple hypothetical liquidation analysis because liquidation under Chapter 7 of the Bankruptcy Code is not possible for a municipal debtor. *See* 11 U.S.C. § 109(b). Instead, in Chapter 9 the best interests of creditors test requires that the Court engage in a "hypothetical dismissal analysis" and consider the effect that dismissal of the Chapter 9 case would have on the debtor, the creditor body at large, and other stakeholders and parties in interest. *See In re Bamberg Cnty. Mem'l Hosp.*, 2012 WL 1890259, *8 (Bankr. D.S.C. May 23, 2012) (holding a Chapter 9 plan was in the best interests of creditors because (1) dismissal would allow those creditors that would be able most promptly to obtain judgments on their claims to benefit at the expense of all other creditors and (2) the plan preserved the availability of healthcare services to local citizens); *In re Sanitary & Improvement Dist., No. 7*, 98 B.R. 970, 975-76 (Bankr. D. Neb. 1989) (overruling objection to confirmation on grounds that Chapter 9 plan was not in the best interests of creditors because, in the event of dismissal, all members of the creditor body would seek judgments that the municipal debtor would be unable to pay and the state court system would be powerless to compromise the debtor's debts). The same result would occur in this case.

In Chapter 9, the best interests of creditors test "has been described as a 'floor, requiring a reasonable effort at payment of creditors by the municipal debtor.'" *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (quoting *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999)). The best interests of creditors test "simply requires the

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

104532132\V-3

Court to make a determination of whether or not the plan as proposed is better than the alternatives." *Sanitary Dist., No. 7*, 98 B.R. at 974. "This is often easy to establish. Since creditors cannot propose a plan; cannot convert to Chapter 7; cannot have a trustee appointed; and cannot force a sale of municipal assets under state law, their only alternative to a debtor's plan is dismissal." *Mount Carbon*, 242 B.R. at 34. Consequently, courts apply the best interests of creditors test "to require a reasonable effort by the municipal debtor that is a better alternative to the creditors than dismissal of the case." *In re Cnty. of Orange*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (quoting 4 COLLIER ON BANKRUPTCY ¶ 943.03[7] (15th ed.)).

Here, the District's Plan easily satisfies the best interests of creditors test. The Plan will result in substantial payments to all classes of creditors, with Class 1 and Class 3 being paid in full. The Plan provides for the sale of the closed, resource draining Hospital for $13 million. In addition, the Plan will restructure the governance of the District and allow for the District's eventual return to the provision of healthcare services to the citizens of West Contra Costa County. If the Chapter 9 Case were dismissed, the District would run out of funds with which to operate, the Hospital would fall into disrepair, and all creditors other than the COPs Holders and potentially the County would go unpaid. Confirmation of the Plan and the repayment of creditors is clearly preferable to the stark scenario posed by dismissal of the Chapter 9 Case, and the Plan therefore satisfies the best interests of creditors test.

With respect to feasibility, "[t]he Code does not define feasibility in Chapter 9 nor does it specify what factors the Court should consider in determining whether the Plan is feasible." *Mount Carbon*, 242 B.R. at 31. Case law interpreting the feasibility requirement in Chapter 9 is limited and no clearly defined test has been established. One court has stated a Chapter 9 plan is feasible if "it offers a reasonable prospect of success and is workable." *Prime Healthcare Mgmt., Inc. v. Valley Health Sys.* (*In re Valley Health Sys.*), 429 B.R. 692, 711 (Bankr. S.D. Cal. 2010).

In determining whether a plan is feasible, courts generally evaluate a debtor's ability to make the payments projected under the plan. *Mount Carbon*, 242 B.R. at 34-35. A Chapter 9 debtor's ability to make the payments contemplated under its plan of adjustment is dependent

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

upon the accuracy of its revenue and expense projections and the reasonableness of the assumptions on which they rely. *See In re Connector 2000 Ass'n*, 447 B.R. 752, 765-66 (Bankr. D.S.C. 2011); *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 453-54 (Bankr. E.D. Cal. 1999). The District is not required to prove with absolute certainty that the Plan will succeed; rather, the standard is that the District establish feasibility by preponderance of the evidence. *Mount Carbon*, 242 B.R. at 34-35.

Here, the District has established by a preponderance of the evidence and will further establish at the Confirmation Hearing that the Plan is feasible. The District has provided detailed financial projections, including both revenue and expense projections, setting forth its expected revenues and expenses from 2018 to 2028. (*See* Emahiser Declaration at 6 through 10 and 25). The District's revenue comes in the form of the Parcel Tax and the *Ad Valorem* Tax -- sources that are predictable and extremely reliable. The District's projections take into account all payments to creditors projected to occur under the Plan and demonstrate that the District will have sufficient funds to make all payments and remain in operation. *Id.* The District has also submitted evidence that, upon confirmation of the Plan, LRC is ready, willing, and able to close on the sale of the Hospital. (See Gorczynski Declaration at 8). As set forth in the Confirmation Declarations, the District's revenue and expense projections are accurate and the assumptions on which they rely are reasonable. The District has therefore carried its burden of establishing by a preponderance of the evidence that the Plan is feasible.

**D.     The Court Should Overrule the Pending Objections to Confirmation of the Plan**.

The following parties filed objections to Confirmation of the Plan: (1) Ambac [Docket No. 180] (the "Ambac Objection"); (2) the Trustee [Docket No. 187] (the "Trustee Objection"); (3) AT&T [Docket No. 192] (the "AT&T Objection"); and (4) Verizon [Docket No. 174] (the "Verizon Objection", together with the AT&T Objection, the "Cellular Rights Objections") (the Ambac Objection, Trustee Objection, and the Cellular Rights Objections are referred to herein, collectively, as the "Objections"). Each of the Objections is addressed separately below.

601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300
DENTONS US LLP

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

### 1.     The Ambac Objection

Ambac begins its objection by stating "[t]his is a sad and troubling case." (Ambac Objection at 1). What is "sad and troubling" is that an insurance company that has not funded a single dollar under its insurance policy - **and whose insured is being paid in full on time with interest under the Plan** - is attempting to block confirmation of a Chapter 9 Plan of a public healthcare district, which Plan proposes to pay the 2004 and 2011 COPs in full with interest at the stated final maturity date, while also paying pension claims, trade claims, workers' compensation claims, and government claims, and which provides a mechanism to provide needed healthcare services to the 250,000 residents of West Contra Costa County.

Ambac throws a veritable kitchen sink of objections at the District, arguing the Plan cannot be confirmed on <u>seven</u> separate bases: (1) the Plan is not in the best interests of creditors because the 2004 COPs Holders would receive a higher recovery if the Chapter 9 Case were dismissed; (2) the Plan is not feasible because it relies on the Excess Parcel Tax to fund the Plan and the District is not entitled to use the Excess Parcel Tax; (3) the Plan has been proposed in bad faith because the Plan impairs the rights of the COPs Holders in order to make payments to junior creditors; (4) the Plan improperly classifies the claims of the 2004 COPs Holders by classifying them together with the 2011 COPs Holders; (5) the Plan is not fair and equitable in the narrow sense because it fails to satisfy 11 U.S.C. § 1129(b)(2)(A)(i) given that it "strips" the COPs Holders of their collateral; (6) the Plan is not fair and equitable in the broader sense because it violates the principles of absolute priority by using Parcel Tax revenues to pay junior claimants and shifting the risk of reorganization to the COPs Holders; and (7) the Plan discriminates unfairly by impairing the COPs Holders while providing superior treatment to junior claims.

Before turning to the merits of Ambac's arguments, however, the District wishes to point out that Ambac's standing to even raise these issues is questionable. Ambac, who voluntarily insured the 2004 COPs, is merely a contingent creditor holding no direct claim against the District. Ambac would only become a creditor of the District in the event the District defaulted on a payment to the 2004 COPs Holders and Ambac had to step in and make a payment, something that has never happened. Indeed, for the 13 years in which the 2004 COPs have been outstanding, the

District has never missed a single payment, a practice that would continue under Plan if it were confirmed because the Plan calls for the payment of the 2004 COPs in full with interest on the existing payment schedule.  The District has filed an objection to Ambac's claim seeking its disallowance as contingent and duplicative of the claims asserted by the 2004 COPs Holders. [Docket No. 152].  Notwithstanding the foregoing, the District address each of Ambac's confirmation objections below.

### a. *The Plan is in the Best Interests of Creditors.*

Ambac argues the Plan is not in the best interests of creditors because the 2004 COPs Holders would receive a higher recovery if the Chapter 9 Case were dismissed.  (Objection at 11-12).  Ambac's argument is based principally on its assertion that the Plan's proposed elimination of certain early redemption rights by the 2004 COPs Holders and a cash reserve "leaves Ambac in a demonstrably worse position than if the case were dismissed."  (Ambac Objection at 12).  As a threshold matter, Ambac is wrong because the Plan proposes to pay the 2004 COPs Holders in full with interest at their stated maturity dates, so the 2004 COPs would not receive a higher recovery if the Chapter 9 Case was dismissed.

Furthermore, Ambac's argument that the "Plan is not in the best interests of Ambac or the 2004 COPs Holders and cannot be confirmed" (*id.*) improperly focuses only on Ambac and the 2004 COPs Holders, rather than on the collective interests of all creditors in this case.  The law in the 9th Circuit is clear -- the best interests of creditors test is evaluated by taking into account all creditors' interest, not the interest of any particular creditor.  *See*, *e.g.*, *In re City of Stockton, California*, 542 B.R. 261, 286 (9th Cir. BAP 2015) (concluding "that the 'best interests' test in chapter 9 considers the collective interests of all concerned creditors in a municipal plan of adjustment rather than focusing on the claims of individual creditors"); *In re City of Detroit*, 524 B.R. 147, 212, 216-17 (Bankr. E.D. Mich. 2014) (reasoning, "it is important to note that the best interests requirement of chapter 9 differs significantly from the best interests requirement in chapter 11 … the question is whether the plan is in the best interests of creditors as a whole.

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  Confirmation may not be denied simply because some creditors may do better upon dismissal. The

2  plain language of the statute compels this result").

3      Ambac's singular focus on its own interests runs directly contrary to this controlling

4  authority, which Ambac notably failed to cite to the Court.  Under the Plan, the Parcel Tax

5  revenues will be sufficient to pay the 2004 COPs in full, with interest, upon their stated maturities.

6  Thus, the reserve funds that Ambac complains it is losing are excessive and entirely unnecessary,

7  and importantly those reserve funds are critical to the District's future plans to provide healthcare

8  services to the citizens of West Contra Costa County.  Accordingly, when properly considering the

9  interests of creditors <u>as a whole</u>, this Court should reject Ambac's arguments and confirm the

10  Plan.

11          b.      <u>*The Plan is Feasible.*</u>

12      Ambac next argues the Plan is not feasible because it relies on the Excess Parcel Tax and

13  Parcel Tax Reserve to fund the Plan, and that the District is not entitled to use the Excess Parcel

14  Tax and Parcel Tax Reserve.  Ambac's objection fails in this regard because the District clearly is

15  entitled to use the Excess Parcel Tax and Parcel Tax Reserve so long as the District affords the

16  COPs Holders the treatment they are entitled under the Bankruptcy Code.

17      Section 1129(b) of the Bankruptcy Code authorizes a debtor to modify the rights of

18  secured creditors under a plan.  As long as a secured creditor receives deferred cash payments

19  totaling the amount of its allowed secured claim and retains its lien on its collateral, the treatment

20  of the secured creditor is permissible.  Moreover, Section 1123 of the Bankruptcy Code states that

21  a plan may provide for the "modification of any lien", the "modification of any indenture or

22  similar instrument", and "extension of a maturity date or a change in an interest rate or other term

23  of outstanding securities", and "modify the rights of holders of secured claims."  11 U.S.C.

24  § 1123(a)(5)(E), (F), (H) and (b) (5) and (6). Thus the modification of the rights and liens of the

25  2004 COPs Holders is absolutely permissible under the Bankruptcy Code.

26      What Ambac and the Trustee appear to assert in their objections is that the Excess Parcel

27  Tax and Parcel Tax Reserve serve as collateral for the claims of the COPs Holders, and if the

28

104532132\V-3

District uses the Excess Parcel Tax and Parcel Tax Reserve for any purpose other than payment to the COPs Holders, then the COPs Holders do not "retain the liens securing such claims" as required by Section 1129(b)(2)(A)(i)(I) of the Bankruptcy Code. In so arguing, Ambac and the Trustee fundamentally misunderstand Section 1129(b)(2)(A)(i) of the Bankruptcy Code. In Chapter 9, a plan is fair and equitable if "the amount to be received by the bondholders is all that they can reasonably expect in the circumstances." *Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (citing *W. Coast Life Ins. Co. v. Merced Irr. Dist.*, 114 F.2d 654 (9th Cir. 1940), cert. denied, 311 U.S. 718 (1941)). Here, the Plan proposes that the Trustee's lien on the Parcel Tax revenues will be fully preserved, and that the COPs Holders will be paid in full, with interest, at their stated maturity dates. They cannot "reasonably expect" anything more, and Section 1129(b)(2)(A)(i) does not require anything more. Subsection (I) of Section 1129(b)(2)(A)(i) is satisfied because the Trustee is retaining its lien on the Parcel Tax revenues, which are sufficient to fully satisfy the claims of the COPs Holders. And subsection (II) of Section 1129(b)(2)(A)(i) is satisfied because the Plan COPs Holders will be paid in full amounts of their claims, with interest, upon their stated maturity dates.[2] The Trustee and Ambac are simply seeking more security for claims that are already fully secured, and that are already being fully paid under the Plan.

Importantly, in the event that the District were to fail to make a scheduled payment to the COPs Holders, the Plan provides as a default remedy that the District's right to use the Excess Parcel Tax and Parcel Tax Reserve for any purpose other than payment to the COPs Holders would terminate, triggering the rights of the COPs Holders to immediately look to the Excess Parcel Tax and Parcel Tax Reserve for payment of their secured claims. The COPs Holders thus have recourse to the Excess Parcel Tax and Parcel Tax Reserve. But in the absence of a default, the COPs Holders should not "reasonably expect" to also receive or otherwise control the Excess Parcel Tax or the Parcel Tax Reserve. The District requires those funds to operate and once-again

---

[2] Section 1129(b)(2)(A)(iii) is also satisfied because the COPs Holders will receive through the Plan the indubitable equivalent of their claims, through payment in full, with interest, at their stated maturity dates.

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

provide needed services to the citizens of West Contra Costa County -- one of the key goals of this Chapter 9 Case.  Balancing the interests of all of the creditors and parties in interest in this case, the Plan is fair and equitable, serves the purposes of Chapter 9 relief generally, and should be confirmed.

Ambac asserts that *In re City of Colorado Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 695-96 (Bankr. D. Colo. 1996) "applies directly to the Debtor's Plan" and holds that a plan is not feasible "where it calls for creditors to be paid from a revenue source to which they are not entitled."  (Ambac Objection at 12).  Ambac's reliance on *Colorado Springs* is misplaced upon a careful reading of *Colorado Springs*.  *Colorado Springs* involved a prepackaged Chapter 9 case.  The prepackaged plan at issue in *Colorado Springs* was in conflict with the terms of the Trust Agreement and the plan did not purport to change the terms of the Trust Agreement. Thus, the Court held the Plan was not feasible.  Importantly, the Court did not rule, and the case does not stand for the proposition, that you cannot amend the terms of a trust agreement.  In fact, the debtor argued that it could amend the terms of the Trust Agreement under Section 1123(a)(5)(F).  The problem was the debtor in *Colorado Springs* had not proposed in its prepackaged plan a modification of the Trust Agreement.  Ambac overstates the holding of *Colorado Springs*, and it is not applicable to this case where the District has proposed to modify the terms of the COPs Documents.

c.  *The Plan is Proposed in Good Faith.*

Ambac asserts the Plan has been proposed in bad faith because the Plan impairs the rights of the COPs Holders in order to make payments to junior creditors, which is "fundamentally unfair to Ambac and does not comport with the basic purpose of Chapter 9."  (Ambac Objection at 15).  As stated above, the Plan pays the 2004 COPs Holders, whose claims Ambac has insured, in full with interest.  It is difficult to discern how such a plan can be viewed as "unfair" or in "bad faith" from the perspective of the COPs Holders, much less a party that has merely voluntarily insured their claims.

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

With respect to Ambac's assertion that the Plan "does not comport with the basic purpose of Chapter 9", the District respectfully disagrees. Chapter 9 is designed not only to provide for the repayment of creditors, but also to assist distressed municipalities in providing government services and otherwise providing for the health, safety, and welfare of their citizens. To that end, Chapter 9 "provid[es] the debtor with an array of bankruptcy powers to enable it to achieve financial rehabilitation with very few, if any, corresponding limitations and duties of the type to which a Chapter 11 debtor is subject." *In re Richmond Unif. Sch. Dist.*, 133 B.R. 221, 224 (Bankr. N.D. Cal. 1991).

Because of its unique role, Chapter 9 provides greater flexibility to the debtor than any other chapter of the Bankruptcy Code. Id. at 225 ("[U]nlike the other Chapters, Chapter 9 does not attempt to balance the rights of the debtor and its creditors, but rather, to meet the special needs of a municipal debtor."). Accordingly, courts assessing plans of adjustment in Chapter 9 cases have emphasized the unique need to consider the general social welfare when addressing the issue of plan confirmation. *See, e.g., Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D. S.C. 2012); *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 454 (Bankr. E.D. Cal. 1999).

Here, rather than focusing all of the resources of the District on **prepaying** the claims of the 2004 COPs Holders, the Plan focuses on paying pension claims, trade claims, workers' compensation claims, and government claims and providing a mechanism to provide needed healthcare services to the 250,000 residents of West Contra Costa County, all while still paying the COPs Holders in full with interest at stated maturities. In light of the unique need to consider the general social welfare in Chapter 9, the District asserts that its Plan strikes the appropriate balance between the rights of secured creditors (or their insurers) and the rights of all other stakeholders in this Chapter 9 case. The Plan therefore comports with the basic purpose of Chapter 9 and is filed in good faith.

    d.    *The Plan Properly Classifies the 2004 COPs Holders and 2011 COPs Holders Together in Class 1.*

601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300
DENTONS US LLP

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Ambac argues that the Plan improperly classifies the claims of the 2004 COPs Holders by classifying them together with the 2011 COPs Holders (Ambac Objection at 15-17). While Ambac admits "the 2004 and 2011 COPs are similar debt instruments", Ambac asserts they should not be classified together for two reasons: (1) the early redemption rights on the 2004 COPs are already vested while the early redemption rights on the 2011 COPs will not vest until 2021; and (2) Ambac insured the 2004 COPs but did not insure the 2011 COPs. (*Id*. at 16-17). As set forth below, however, the claims of the 2004 COPs holders and 2011 COPs holders are substantially similar, an it is appropriate for the District to classify them together.[3]

A plan proponent has broad discretion to adopt classification schemes in a plan of adjustment. The Code's only restriction on this discretion is that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. *See* 11 U.S.C. § 1122(b).

Section 1122 of the Bankruptcy Code does not require that similar claims be classified together; it merely prohibits a debtor from jointly classifying dissimilar claims. *In re Woodbrook Assocs.*, 19 F.3d 312, 318 (7th Cir. 1994); *In re US Truck Co., Inc.*, 800 F.2d 581, 585 (6th Cir. 1986); *In re Baldwin Parke Towne Ctr., Ltd.*, 171 B.R. 374, 376 (Bankr. C.D. Cal. 1994). While debtors generally enjoy wide latitude in classifying claims, "[m]ost courts have agreed that § 1122 contemplates some limits on the separate classification of similar claims." *In re Barakat*, 99 F.3d 1520, 1524-25 (9th Cir. 1996). "'There is one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.'" *Id.* at 1525 (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991)). Separate classification of

---

[3] Ambac filed an objection to the District's Disclosure Statement in which Ambac raised a host of legal, confirmation issues with respect to the Plan. Ambac did not include improper classification of the 2004 COPs with the 2011 COPs among its many confirmation objections. Instead, Ambac waited until its confirmation objection. Had Ambac raised improper classification at the Disclosure Statement case along with the other confirmation issues it raised at that time then, prior to solicitation, the District could have determined whether to separately classify the claims of the 2004 and 2011 COPs Holders in order to accommodate Ambac.

similar claims is permitted so long as the purpose of such classification is not to gerrymander an impaired accepting class and the classification serves a legitimate business or economic purpose. *In re Loop 76, LLC*, 465 B.R. 525, 536 (9th Cir. B.A.P. 2012) ("if the claims are substantially similar, the plan may place such claims in different classes if the debtor can show a business or economic reason for doing so") (citing *Barakat*, 99 F.3d at 1526).

Here, it is clear that the District did not classify the claims of the 2004 and 2011 in order to gerrymander an impaired accepting class. To the contrary, had the District separately classified the 2004 COPs from the 2011 COPs the District would have had a **better** result - the 2011 COPs standing alone voted to accept the Plan and it is only the vote of one 2004 COPs Holder that led to rejection by Class 1. The District therefore received no better outcome with respect to class voting by classifying these claims together and cannot possibly be said to have classified them to engineer an impaired accepting class or otherwise manipulate the vote.

Moreover, the claims of the 2004 and 2011 COPs Holders are clearly substantially similar for at least the following reasons: (1) both sets of COPs holders share the same borrower; (2) both sets of COPs are administered by the same Trustee; (3) both sets of COPs holders share *pari passu* in the same collateral; and (4) the documents evidencing the interests of both sets of COPs Holders are substantially identical. It is therefore appropriate to classify all of the COPs Holders together in Class 1.

e. *The Plan is Fair and Equitable in the Narrow Sense Because it Satisfies 11 U.S.C. § 1129(b)(2)(A)(i).*

Ambac argues the Plan is not fair and equitable in the "narrow sense", meaning it does not satisfy the objective test set forth in Section 1129(b)(2)(A)(i), because it strips the COPs Holders of their collateral. (Ambac Objection at 17-18). As set forth in Part II.C.6.a. above, a plan is fair and equitable as to a secured creditor if it provides that the secured creditor will retain its lien on its collateral while receiving deferred cash payments totaling at least the allowed amount of its secured claim. 11 U.S.C. § Section 1129(b)(2)(A)(i). Here, the COPs Holders are being paid in full at the amortization schedule and interest rate set froth in the COPs Documents. Ambac does

not contest that the COPs Holders are receiving deferred cash payments totaling at least the amount of their allowed secured claims. Instead, Ambac argues the COPs Holders do not "retain their lien" in the Parcel Tax because the District is using the Excess Parcel Tax and Parcel Tax Reserve, in which the COPs Holders hold a lien, to fund Plan payments.

Here, the Plan provides for payment in full to the COPs Holders. In the event that the District were to fail to make a scheduled payments to the COPs Holders, the District would be in default under the Plan, the District's right to use the Excess Parcel Tax and Parcel Tax Reserve for any purpose other than payment to the COPs Holders would terminate, and the COPs Holders could immediately look the Excess Parcel Tax and Parcel Tax Reserve for payment of their secured claims. The COPs Holders thus have recourse to the Excess Parcel Tax and Parcel Tax Reserve and retain their liens in the Parcel Tax as required by Section 1129(b)(2)(A)(i)(I) of the Bankruptcy Code. In fact, Section 1129(b)(2)(A) (i)(I) simply requires that the secured creditor retain its lien <u>whether the property subject to such liens is retained by the Debtor or transferred to another entity</u>. It does not require that the secured creditor hold 100% of its collateral at all times.

### f. *<u>The Plan is Fair and Equitable in the Broader Sense.</u>*

Ambac argues the Plan is not fair and equitable in the broader sense because it violates the principles of absolute priority by using Parcel Tax revenues to pay junior claimants and shifting the risk of reorganization to the COPs Holders. (Ambac Objection at 19-20). As discussed above, the treatment afforded the COPs Holders is permissible under the Bankruptcy Code because the Plan proposes to pay the COPs Holders in full with interest and the COPs Holders retain their liens on the Parcel Tax. The Plan comports with the purpose and spirit of Chapter 9 by Plan striking the appropriate balance between the rights of secured creditors and the rights of all other stakeholders in this Chapter 9 case.

With respect to Ambac's concern that the Plan impermissibly shifts the risk of reorganization to Ambac or the COPs Holders, Ambac and the COPs Holders were both well-aware of the risks associated with the COPs at the outset of their investment. Ambac voluntarily insured the 2004 COPs. In connection with the closing of the 2004 COPs transaction, the 2004

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

COPs Holders and Ambac received a Preliminary Official Statement Dated July 8, 2004 (July 2004 Official Statement, attached to the White Declaration as Exhibit M). The purpose of the July 2004 Official Statement was to provide Ambac and the 2004 COPs Holders with information about the investment they were preparing to make and the risks associated with such investments. In a section with the heading "**RISKS TO OWNERS OF CERTIFICATES**" and the subheading "<u>Bankruptcy</u>", the July 2004 Official Statement explicitly stated as follows:

> the rights of the Trustee to enforce its rights, including security interests and other liens, in the Parcel Tax Revenues could be delayed, altered or otherwise modified during the pendency of a bankruptcy proceeding . . . Given the legal characteristics of the District, such a petition would be eligible to be filed only under Chapter 9 of the Bankruptcy Code . . . . In connection with a bankruptcy case, the District could propose and confirm a plan for the adjustment of debts and thereby modify or alter the rights of creditors generally, or of any class of creditors, secured (such as the Trustee) or unsecured . . . . Because the Trustee holds a valid fully secured lien under state law in the Parcel Tax Revenues, the District would have to repay the Trustee's claim in full. However, with the Court's approval, the District could restructure the obligation over an extended, but reasonable, period of time; provided it ultimately repaid the Trustee's secured claim in full with interest.

(July 2004 Official Statement at 15). Further, on July 27, 2004, the 2004 COPs Holders and Ambac obtained an opinion from the Orrick law firm stating that the COPs Documents were enforceable but that "the rights and obligations under the Certificates, the Installment Sale Agreement, the Assignment Agreement, the Trust Agreement, and the Tax Certificate and their enforceability may be subject to bankruptcy, insolvency, reorganization, arrangement, fraudulent

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Case: 16-42917    Doc# 209    Filed: 09/28/17    Entered: 09/28/17 12:24:18    Page 41 of 52
104532132\V-3

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   conveyance, moratorium and other laws relating to or affecting creditors' rights . . . ." (2004

2   Orrick Opinion Letter, attached to the White Declaration as Exhibit L, at 2).[4]

3        The 2004 COPs Holders are being paid in full with interest. Ambac and the 2004 COPs

4   Holders voluntarily invested in the COPs, which have consistently paid them a high rate of interest

5   and as to which the District has never missed a payment and will not miss a payment under the

6   Plan. The 2004 COPs Holders invested in the COPs, and Ambac insured their investment,

7   knowing full well that "the rights of the Trustee to enforce its rights, including security interests

8   and other liens, in the Parcel Tax Revenues could be delayed, altered or otherwise modified during

9   the pendency of a bankruptcy proceeding" and that "[i]n connection with a bankruptcy case, the

10   District could propose and confirm a plan for the adjustment of debts and thereby modify or alter

11   the rights of creditors generally, or of any class of creditors, secured (such as the Trustee) or

12   unsecured . . . .". The Plan therefore cannot be found to be unfair or inequitable to Ambac or the

13   2004 COPs Holders in the broader sense.

14                g.     *The Plan Does Not Discriminate Unfairly.*

15        Finally, Ambac argues the Plan discriminates unfairly "by providing superior treatment to

16   junior unsecured classes, including leaving the County's unsecured contractual rights unimpaired

17   and paying out on its separate unsecured claim (as well as the unsecured claims of others)."

18   (Ambac Objection at 22). It is difficult to fathom how a creditor who is being paid in full with

19   interest can complain of unfair discrimination. The only class unimpaired under the Plan is Class

20   3, the WCCHD Successor Pension Claims. All other classes are impaired and are not being paid

21   in full.

22        The Class 1 claims of the COPs Holders are secured. As such, the unfair discrimination

23   analysis is inapplicable to the treatment of Class 1. "T[he prohibition on unfair discrimination]

24   has little, if any, significance in the context of a secured claim." <u>In re Riddle</u>, 444. B.R. 681, 686

25

_____

26   [4] Identical or substantially similar statements and disclaimers were contained in the Official

27   Statement and Orrick Opinion Letter delivered in connection with the 2011 COPs Documents.
(White Declaration at 33 and 34).

28

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

(Bankr. N.D. Ga. 2011); *accord In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ("Unlike unsecured claims, every secured claim is different. Secured claims usually are secured by different collateral and usually have different priorities even if secured by the same collateral. This fact leads to the permissibility of individualized treatment based on the particularities of each secured claim."). Given that Class 1 is being paid in full with interest, the Plan cannot be said to unfairly discriminate against Class 1.

## 2. The Trustee Objection

In the Trustee Objection, the Trustee asserts: (1) the Plan is not feasible (Trustee Objection at 12-15); (2) the Plan fails to comply with Section 1129(b) of the Bankruptcy Code (*id*. at 15-16); and (3) the treatment of the COPs Holders under the Plan fails to comply with applicable law under Bankruptcy Code Sections 928 and 943(b)(4) as well as California Government Code Section 5451.5 (*id*. at 9-12). The Trustee's feasibility and 1129(b) arguments are addressed above in the Response to Ambac Objection and in Sections II.C.6 & 13 of this Brief. With respect to the Trustee's final argument, the Plan complies with all applicable law as set forth below.

US Bank asserts the Plan is not confirmable under Section 943(b)(4) of the Bankruptcy Code because the proposed treatment of the COPs Holders is prohibited by applicable law. In support of its argument, US Bank points to three applicable laws: (1) California Government Code Section 5451.5, which provides US Bank with a statutory lien on the Parcel Tax revenues; (2) Section 928 of the Bankruptcy, which provides that special revenues acquired by a debtor after the commencement of a Chapter 9 case shall remain subject to any prepetition security interest, subject to the right of the debtor to use such revenues to fund operations; and (3) Chapter 9 generally, which US Bank asserts evidences a broad Congressional intent to protect special revenues bondholders and prevent any impairment whatsoever of the rights of the COPs Holders. None of these applicable laws render the Plan unconfirmable, and the Plan complies with applicable law by impairing the Trustee's claims in precisely the manner authorized by the Bankruptcy Code.

104532132\V-3

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**First**, with respect to California Government Code Section 5451.5, the District agrees that such section provides the Trustee with a statutory lien on the Parcel Tax. The Plan expressly preserves such lien and, in the event of a Plan default, the Trustee will be entitled to exercise its remedies against such collateral. The Trustee asserts, however, that *Section 5451.5 absolutely prevents the District from modifying the Trustee's lien in any way*. The Trustee's position is absolutely unsupported by applicable law, and indeed is contradicted by applicable bankruptcy law. The Bankruptcy Code expressly allows debtors to impair the rights of creditors, including secured creditors. "Section 943(b)(4) does not prevent the debtors from proposing a plan that impairs the rights of [creditors]. This provision applies to postpetition actions after confirmation of the plan." *In re City of Columbia Falls, Mont. Special Improvement Dist. No. 25*, 143 B.R. 750, 760 (Bankr. D. Mont. 1992). The requirement that a plan comply with applicable law is <u>prospective</u> and applies only to post-confirmation actions proposed in a plan of adjustment; it does not restrict a debtor's ability to impair claims pursuant to a plan. *See id.*

If the Trustee's argument were correct, a debtor could never modify the rights of creditors with statutory liens on special revenues in a Chapter 9 case. Bankruptcy Courts routinely approve cramdown plans that alter contractual rights of secured creditors. The ability to impair secured claims extends to claims secured by liens on "special revenues" (as defined in Section 902(2) of the Bankruptcy Code) such as those held by the Trustee. *See In re Jefferson Cnty.*, 482 B.R. 404 (Bankr. N.D. Ala. 2012). The Court in Jefferson Cnty. noted that "Congress passed amendments that were designed to keep the framework of special revenue financing unaltered by the provisions addressed by the 1988 Amendments," but that "This should not be read to mean that, if applicable, other sections of the Bankruptcy Code, 11 U.S.C. § 101 et seq., not changed by the 1988 Amendments may not be available to modify the contractual relations between parties to municipal special revenue financing agreements." *Id.* at 434, n.17. The Court further noted "the overall goal was to retain as much as possible the pre-bankruptcy status of pledged special revenue financing transactions involving municipalities," but "Again, this is only with respect to the specific sections addressed by the 1988 Amendments. It does not mean that other sections of the

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Bankruptcy Code, 11 U.S.C. § 101, et seq., may not be available to otherwise alter aspects of pledged special revenue transactions involving municipalities. *See*, *e.g.*, 11 U.S.C. §§ 363(c)–(e), 506(c), 901(a), & 1129(b)(1)–(b)(2)(B)." *Id.* at 434, n.18.

As the Court held in the Detroit Chapter 9 bankruptcy, the Bankruptcy Code permits the impairment of claims. *In re City of Detroit, Mich.*, 504 B.R. 97, 150 (Bankr. E.D. Mich. 2013) ("Impairing contracts is what the bankruptcy process does."). Applicable state law prohibiting impairment of claims is expressly overridden by the Bankruptcy Code. *See id.* (holding Michigan Constitution, which prohibited impairment of pension claims, is overridden by Chapter 9 of the Bankruptcy Code). The requirement in Section 943(b) of the Bankruptcy Code that a plan comply with applicable state law applies prospectively, <u>after</u> confirmation of the Plan, and does not prohibit the impairment of claims pursuant to a plan. *See In re City of Detroit, Mich.*, 524 B.R. 147, 211-212 (Bankr. E.D. Mich. 2014) (section 943 does not prohibit the impairment of claims in a manner that is contrary to state law, "[r]ather, the effect of § 943(b)(4) is limited to the actions that the municipality must take to implement the plan once the court confirms it."); *see also In re Sanitary & Improvement Dist., No 7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("The Bankruptcy Code permits modification of bondholder rights. The Bankruptcy Code permits an issuance of new bonds with different face amounts and different interest rates that the original bonds held by the bondholders prior to bankruptcy. However, those 'new bonds' simply become a substitute for the original obligation and they must be issued in conformance with state law and the terms of their redemption and payment must be in conformance with state law.").

**<u>Second</u>**, with respect to Section 928 of the Bankruptcy Code, Section 928(a) merely provides that special revenues acquired by a debtor after the commencement of a Chapter 9 case shall remain subject to any prepetition security interest. Here, the Plan provides that the Trustee shall retain its lien on the Parcel Tax, the Plan merely modifies the payment stream to the COPs Holders in a manner that, as described above, complies with Sections 1129(a) and (b) of the Bankruptcy Code. Moreover, Section 928(b) of the Bankruptcy Code expressly provides that any such lien shall be subject to the necessary operating expenses of the District. The Trustee and

Case: 16-42917    Doc# 209    Filed: 09/28/17    Entered: 09/28/17 12:24:18    Page 45 of
52
104532132\V-3

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Ambac maintain that Section 928(b) applies post-confirmation.  See Trustee Objection, p. 10 and Ambac Objection p.13, n.16.  Though the Trustee cites to *Jefferson Cnty.* for the proposition that Section 928(b) "must be adhered to post-confirmation," the *Jefferson Cnty.* Court actually stated the opposite, reasoning, "When 11 U.S.C. § 928(b) comes into play in a municipal bankruptcy is an initial issue comprised of a time element and a standard component. The time element is technically **during the pendency of a case from its filing up to confirmation of the municipality's plan of adjustment of debts**. *Compare* 11 U.S.C. § 928, *with* 11 U.S.C. § 944. This means the time of § 928(b)'s subordination is measured in months to, hopefully, not more than a few years. **The point is that it is not permanent**. It is designed to keep the system or project operating **pending a final resolution of a municipal bankruptcy case**."  482 B.R. at 436 (emphasis added).  Ambac's objection merely follows the Trustee's objection on this point.  They are both clearly wrong that Section 928(b) applies post-confirmation; accordingly, their arguments concerning the post-confirmation effect of Section 928(b) with regard to the Plan should be summarily rejected.

**Third** and finally, the Trustee asserts that any impairment of the rights of the COPs Holders is prohibited generally by Chapter 9.  In support of this argument, the Trustee points to Sections 922 and 928 of the Bankruptcy Code, which were enacted in 1988 to protect the rights of special revenue bondholders such as the COPs Holders.  (Trustee Objection at 11).  The Trustee asserts that such sections of the Bankruptcy Code "were enacted to prevent impairment of special revenue debt." (Trustee Objection at 12).

The Trustee's reading of the 1988 amendments goes too far.  Nowhere in the 1988 amendments did Congress enact a blanket prohibition on the modification of liens secured by special revenues, and, as explained above, applicable law, including Section 1129(b) of the Bankruptcy Code, allows special revenue liens to be modified in Chapter 9.  As stated by the Court in *Columbia Falls*, although the goal of certain 1988 amendments to Chapter 9 of the Bankruptcy Code was "to retain as much as possible the pre-bankruptcy status of pledged special revenue financing transactions involving municipalities," those sections of the Bankruptcy Code

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

not changed by the 1988 amendments (e.g., Section 1129(b)(1)-(b)(2)(B) regarding nonconsensual impairment) remain available to "modify the contractual relations between parties to municipal special revenue financing agreements" or to "otherwise alter aspects of pledged special transactions involving municipalities". 143 B.R. at 760.

In summary, the Trustee, like Ambac, is taking the position that the District is absolutely prohibited from modifying the Trustee's lien in any respect because such modification is contrary to applicable law. The Trustee, like Ambac, is wrong. Here, the Plan provides for the impairment of the Trustee's claim in the manner expressly permitted by the Bankruptcy Code. The Plan thus complies with applicable state law under Section 943(b) of the Bankruptcy Code and should be confirmed.

### 3. The Cellular Rights Objections

In the Cellular Rights Objections, AT&T and Verizon assert that they have the contractual right to maintain their Cell Boxes atop the Hospital and that the Hospital cannot be sold free and clear of their rights because of Section 365(h).

Before addressing the legal merits of the Cellular Rights Objections, the District urges the Court to consider their practical implications. Sustaining the Cellular Rights Objections and blocking the sale of the Hospital would produce a result completely inconsistent with the fundamental purposes of the Bankruptcy Code. The Hospital is no longer in operation. It sits a dark, empty, eight-story building that constantly drains the District's dwindling resources and provides no benefit to the District. The District has a plan to sell the Hospital for $13 million, providing needed creditor recoveries and relief from a cash-draining and useless burden. The Cellular Rights Parties, however, insist that this empty building must remain standing and not be sold so that the Cell Boxes may sit atop its roof until 2026, essentially serving as an enormous, $13 million Cell Box platform that drains the resources of a healthcare district that is home to over 250,000 citizens of Contra Costa County. The Cellular Rights Objections, if sustained, would block confirmation of a Plan that maximizes value and produces significant returns for creditors. Moreover, if the Plan is not confirmed and the Hospital not sold, the District will run out of funds completely and have no resources with which to provide security to the Hospital or pay for the

electricity that the Cell Boxes use to operate. Sustaining the Cellular Rights Objections would therefore produce an absurd result contrary to the fundamental purposes of the Bankruptcy Code.

Putting aside the practical import of the Cellular Rights Objections, the objections lack legal merit. The District does not have any written lease agreements with AT&T and Verizon and the District is not seeking to reject them. (White Declaration at 27). Pursuant to the Crown Castle Successor Leases, Crown Castle was granted the right: (i) to enforce all of lessors rights and remedies; (ii) collect all rent due from Verizon and AT&T; and (iii) the right to enter into leases of the Hospital with Verizon and AT&T. In essence, whatever lease interest, if any, Verizon and AT&T have, at this point in time, they have been granted that interest from Crown Castle and not the District. AT&T and Verizon have no 365(h) rights because the District is not rejecting an unexpired lease of real property under which the District is the lessor as required by 365(h). In essence, AT&T and Verizon should be deemed to be sub-tenants of Crown Castle whose rights disappear once the Crown Castle Successor Leases are terminated and rejected.[5] With respect to the Crown Castle Successor Lease, the District has entered into a proposed settlement with Crown Castle whereby such lease will be rejected and Crown Castle will waive its rights under Section 365(h) of the Bankruptcy Code and terminate any interest it has in the Hospital. (See Docket No. 183.) Once Crown Castle's Successor Leases are rejected and terminated, AT&T and Verizon have no further right to occupy the roof of the Hospital. The District is therefore not seeking to reject any agreements with Verizon or AT&T, and, therefore, Section 365(h) of the Bankruptcy Code is not implicated by the proposed sale of the Hospital.

If and to the extent that Verizon and AT&T have rights under Section 365(h) of the Bankruptcy Code, the District may sell the Hospital free and clear of those rights. Section 1123(a)(5)(D) authorizes a debtor to sell all or any part of the property of the estate, either subject

---

[5] AT&T and Verizon argue that 365(h) applies to subleases citing *In re Amicus Windown Corp.*, 2012 Bankr. Lexis 622 (Bankr. D. Del. 2012) and *In re: Elephant Bar Rest. Inc.*, 195 B.R. 353 (Bankr. W.D. Pa. 1996). Neither of these cases support the position of AT&T and Verizon because both of these cases involve rejections of leases where the debtor was the sublessor. That is not the situation in this case. Here, the landlord to Verizon and AT&T is Crown Castle and not the District and, therefore, *Amicus Windown Corp* and *Elephant Bar Rest., Inc.* are not applicable.

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property. 11 U.S.C. § 1123(a)(5)(D). This provision should be read together with Code section 1123(b)(4), which provides that a plan of reorganization may provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests. 11 U.S.C. § 1123(b)(4). The methods of plan implementation set forth in Section 1123(a)(5) are "self-executing". *In re Art & Architecture Books of the 21st Century*, No. 2:13-BK-14135-RK, 2016 WL 1118743, at *10 (Bankr. C.D. Cal. Mar. 18, 2016). In other words, a plan of reorganization may propose actions to implement the plan notwithstanding contrary non-bankruptcy law or agreements. *Id.* (citing 7 Resnick and Sommer, COLLIER ON BANKRUPTCY, ¶ 1123.01[5] at 1123–10–1123–11 and n. 21, *citing inter alia*, *Pacific Gas & Electric Co. v. California ex rel. California Dept. of Toxic Substances.*, 350 F.3d 932, 937 (9th Cir.2003). The examples of adequate means for implementation of a plan provided in section 1123(a)(5) are illustrative and the section does not exclude or limit any other means. *Id.* In this instance, the District's Plan provides for the sale of its assets under Sections 1123(a)(5) and 1123(b)(4) and (6) and 105.

As the Ninth Circuit recently held in *In re Spanish Peaks Holdings II, LLC*, 862 F.3d 1148 (9th Cir. 2017) ("Spanish Peaks"), Section 365(h) does not apply to protect the rights of a lessee of real property where such real property is being sold and where there has been no prior, formal rejection of the lease under Section 365. 862 F.3d at 1155-56. Even where a sale free and clear arguably has the same effect as a rejection of a lease in an every day sense, where there is no formal rejection of a lease under Section 365 of the Bankruptcy Code, the real property may be sold free and clear. *Id.* at 1156. As noted by the 9th Circuit:

> We agree that section 365 embodies a congressional intent to protect lessees. But that intent is not absolute; it exists alongside other purposes and sometimes conflicts with them. To some extent, protecting lessees reduces the value of the estate - property presumably fetches a lower price if it is subject to a lease - and is therefore contrary to the goal of "maximizing creditor recovery", another core purpose of the Code.

*Id.* at 1157.

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1     While *Spanish Peaks* did not involve a Chapter 9 sale, its reasoning should be applied by

2    the Court to this case.  *Spanish Peaks* relied on the only other Circuit Court decision on point.  In

3    *Precision Indus. v. Qualitech Steel SBQ (In re Qualitech Steel, Corp.) ("Precision Indus.")*, 327

4    F.3d 537, 540 (7th Cir. 2003), in an issue of first impression, the Seventh Circuit reconciled two

5    distinct provisions of the Bankruptcy Code: section 363(f), which authorized the sale of a debtor's

6    property free of any "interest" other than the estate's, and section 365(h), which protected the

7    rights of the lessee when the debtor rejected a lease of estate property. The Seventh Circuit held

8    that the sale order extinguished the lessee's possessory interest under the plain terms of section

9    363(f).

10       Other cases have held that a free and clear sale extinguishes a lease. *See*, *e.g.*, *Bruce*

11    *Grohsgal, Colder Than A Landlord's Heart? Reconciling A Debtor's Authority to Sell Property*

12    *Free and Clear of A Lease Under Bankruptcy Code Section 363(f) with the Tenant's Right to*

13    *Remain in Possession on A Lease Rejection Under Bankruptcy Code Section 365(h) ("Reconciling*

14    *A Debtor's Authority to Sell Property Free and Clear")*, 100 Marq. L. Rev. 295, 316 (2016)

15    (compiling cases).

16       By way of example, in *In re Hill*, 307 B.R. 821, 825-26 (Bankr. W.D. Pa. 2004), the

17    bankruptcy court held that, although the courts of the third circuit had not yet considered whether

18    a sale under section 363(f) terminated leaseholds, it found persuasive the exhaustive treatment of

19    the issue and conclusions by the Seventh Circuit in *Precision Indus., supra*. As a consequence, the

20    bankruptcy court held that the order that authorized the sale of the premises therein that was

21    granted "without limitation," extinguished whatever possessory interest the debtor may have had

22    in the property. *Id.* at 825.

23       Further, in *In re Ng*, 2007 WL 4365564, at *1 (Bankr. N.D. Cal Dec. 13, 2007), the

24    bankruptcy court entered an order authorizing the trustee to sell property free and clear of certain

25    leasehold and possessory interests held by Patricia Hewlett, pursuant to section 363(f) of the

26    Bankruptcy Code.  In connection with Hewlett's motion to stay, the bankruptcy court held that the

27    order authorizing sale of the property free and clear of all of Hewlett's interests under section

28

104532132\V-3

363(f) extinguished all of her interests in the property as of the sale closing, including any rights under section 365(h). *Id.* (citing *Precision Indus.*).  On appeal, the district court upheld the bankruptcy court. *Hewlett v. U.S. Bankr. Court*, 2007 WL 3232239, at *1-2 (Bankr. N.D. Cal. Oct. 31, 2007). Hewlett also argued to the district court that the bankruptcy court's order was clearly erroneous because it conflicted with local landlord/tenant law. The district court held that it is a well-established principle that pursuant to the Supremacy Clause, federal law trumps state and municipal laws that "interfere with, or are contrary to" it. Id. (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). The district court held that the notion that a bankruptcy judge could not act under a provision of the bankruptcy code because it would conflict with San Francisco's Tenant's Rights Ordinance was a non-starter. Id.

The only remaining issues with respect to the Cellular Rights Objections is whether and to what extent AT&T and Verizon are entitled to adequate protection on account of their rights being extinguished.  It is not at all clear that AT&T and Verizon are entitled to any form of adequate protection.  In *In re R.J. Dooley Realty*, 2010 WL 2076959, at *6 (S.D. Bankr. May 21, 2010), the bankruptcy court approved the sale of property free of pre-existing tenant leases pursuant to section 363(f).  The tenant argued that sections 363(e) and section 365(h) required adequate protection of the tenant's interests. *Id.* The bankruptcy court held that the tenant was not entitled to adequate protection under section 363(e) because it was not a secured creditor or a lessor. *Id. See also In re: MMH Auto. Grp.*, 385 B.R. at 372.  Section 361 of the Bankruptcy Code governs adequate protection and provides that adequate protection may be required under Sections 362, 363, or 364 of the Bankruptcy Code.  Here, the District proposes to sell the Hospital pursuant to, among other things, Sections 1123(a)(5)(D), 1123(b)(4) and (6) and 105 of the Bankruptcy Code through a plan sale.  Further, Section 363 - including 363(e) - does not apply in a Chapter 9 case. See U.S.C. § 901(a) and, therefore, AT&T and Verizon are not entitled to adequate protection.

Nonetheless, to the extent the Court finds that AT&T and Verizon are entitled to adequate protection, the District and LRC propose to provide the following to each of AT&T and Verizon on account of their having to remove the Cell Boxes from the Hospital: (1) a license until July 31,

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

2020 from the District and Tribe to relocate the Cell Boxes to a Cell On Wheels, mobile cell site, or similar structure (a "COW") to be located in the parking lot owned by the District or LRC adjacent to the current Hospital location, and (2) reimbursement from the proceeds out of the sale of the Hospital of the actual, documented costs incurred by AT&T and Verizon in relocating the Cell Boxes to the COW, not to exceed $200,000 each. (*See* Declaration of Gorczynski at 9 and 10). Providing AT&T and Verizon with a COW license until July 31, 2020 will provide them with sufficient time to find a new, permanent location for the Cell Boxes and constitutes sufficient adequate protection under the facts and circumstances of this Chapter 9 Case.[6]

### III. CONCLUSION

For the reasons set forth herein, the District submits that the Plan fully satisfies all applicable requirements of the Bankruptcy Code and Bankruptcy Rules and respectfully requests that this Court overrule the Objections and confirm the Plan.

Dated: September 28, 2017

DENTONS US LLP

By: /s/ Samuel R. Maizel
Samuel R. Maizel
Attorneys for Debtor

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

---

[6] *See* Declaration John Troughton at 13: "I believe there are a number of temporary and permanent sites available to Verizon and AT&T in the immediate area where the Property is located to relocate their cell boxes from the Property if they were willing to move or were ordered to move."

Case: 16-42917    Doc# 209    Filed: 09/28/17    Entered: 09/28/17 12:24:18    Page 52 of 52
104532132\V-3